No. 101,208

STATE OF KANSAS, *Appellee*, v. JERRY D. SELLERS, JR., *Appellant.*
(253 P.3d 20)

Opinion filed April 22, 2011.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*David E. Yoder*, county attorney, argued the cause, and *Steve Six*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This is a direct appeal from defendant Jerry D. Sellers, Jr.'s jury conviction on two counts of aggravated indecent liberties with a child, in violation of K.S.A. 21-3504(a)(3)(A). Sellers re-

ceived a consecutive 72-month prison sentence on Count 1 and 59-month sentence on Count 2. The district court judge also ordered that Sellers be subject to lifetime postrelease supervision and lifetime electronic monitoring.

Sellers raises five issues for our consideration: (1) Whether the district judge erred in denying his motion for a psychological evaluation of the victim; (2) whether his convictions were multiplicitous; (3) whether the order for lifetime postrelease is unconstitutional; (4) whether the district judge erred in modifying his sentence; and (5) whether the district judge erred by ordering lifetime postrelease and lifetime electronic monitoring.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Incidents and Accusation

Sellers lived with C.M. and her 13-year-old daughter, M.R.C., in C.M.'s home. Sellers and C.M. had previously been deployed together in the Army National Guard, serving in Kuwait. Sellers' relationship with M.R.C. became strained, and C.M. and M.R.C. began to argue about him. The worst of these arguments occurred in early December 2007.

On December 3, 2007, C.M. went to her sister's home to talk about the situation. C.M. asked her sister to try to talk to M.R.C. to find out what was bothering her. The sister did as asked the same evening while making dinner with M.R.C. When M.R.C. learned from the sister that Sellers was going to ask C.M. to marry him, M.R.C. told the sister that Sellers had touched her. Upon urging by the sister, M.R.C. also told C.M. that Sellers had touched her "up top and down below."

Later that evening, C.M. told Sellers that M.R.C. had said he touched her breast and "down there." C.M. told Sellers she would get him some help. When Sellers left for work the next morning, however, C.M. took M.R.C. to the police station to report the incident.

C.M. and M.R.C. arrived at the police station at 6 a.m. and met with Officer Joshua Lowe to give an initial report. Lowe interviewed C.M. and M.R.C. and prepared a report before referring the case to a detective for further investigation.

M.R.C. reported that Sellers put his hands up her shirt and felt her chest and touched her on her pubic area. Lowe asked a series of yes/no follow-up questions, including whether "Jerry had put his hands down her pants." M.R.C said Sellers had not done so. M.R.C. believed that the touching incident occurred around Saturday, November 17, 2007. Lowe asked M.R.C. if she was home alone with Sellers when the touching occurred, and she replied that she was. In addition, in response to Lowe's question about how Sellers went about touching her, M.R.C. said that Sellers just walked up and touched her.

Lowe eventually would testify that his purpose with the initial interview was to get enough information to see if the matter warranted calling in a detective to conduct a forensic interview.

At 10 a.m. the same day as the Lowe interview, Detective Michael Yoder interviewed M.R.C. at the Heart to Heart Advocacy Center. M.R.C. told Yoder that she did not get along with Sellers and worried that he would divert her mother's affection. M.R.C. also told Yoder that the touching incident occurred around Thanksgiving; she thought it happened on November 16.

Describing the incident, M.R.C. told Yoder that between 10 a.m. and 11 a.m., she went to lie down with her mother on her mother's bed. M.R.C. lay on one side of the bed and her mother on the other, and the two held hands. Sellers joined them on the bed, lying between M.R.C. and her mother with his head level with M.R.C.'s waist. Sellers put his arm over M.R.C.'s leg, then moved his hand so it was between M.R.C. and the mattress, and then moved it from touching her stomach to her chest. M.R.C. told Yoder that when Sellers' hand had reached her breast, he moved his hand around over her breast. Sellers then stopped touching M.R.C. and left the room to go check on the family's dog, which was making noise in another room.

M.R.C. told Yoder that Sellers then came back into the room, checked to see if her mother was asleep, lay back down, and put his hand on M.R.C.'s leg. He moved his hand up to M.R.C.'s pubic area. Sellers then got off the bed again and walked over to her mother's side of the bed to see if she was still asleep. He then walked to M.R.C.'s side of the bed and started to push M.R.C.'s

shirt up. At that point, M.R.C. squeezed her mother's hand and woke her up.

Yoder asked M.R.C. if there had been any other incidents in which Sellers touched her inappropriately; and she said there was another incident the previous Halloween. M.R.C. said that Sellers touched her on her buttocks when she, Sellers, and her mother were cooking in the kitchen. M.R.C. also reported a third incident, in which she hugged Sellers goodnight and he grabbed her on the buttocks.

*The Charges and Pretrial Proceedings*

Sellers was charged with three counts of aggravated indecent liberties with a child under K.S.A. 21-3504(a)(3)(A). Count 1 was for touching M.R.C.'s breast on or about November 17, 2007. Count 2 was for touching M.R.C.'s pubic area on or about November 17, 2007. Count 3 was for touching M.R.C.'s buttocks around Halloween 2007.

At Sellers' December 19, 2007, preliminary hearing, M.R.C. testified. Her story about the touching on the bed around Thanksgiving was the same as that she had told to Yoder. On cross-examination, M.R.C. admitted that she initially dismissed the Halloween touching of her buttocks as accidental. She also admitted that she did not tell anyone about Sellers touching her until she learned about Sellers' and her mother's marriage plans and that this news upset her.

About a month after the preliminary hearing, Sellers filed a notice of alibi, stating that he was on duty with the Army National Guard on November 17, 2007, *i.e.*, the date of the incidents supporting Counts 1 and 2.

The State filed its first amended complaint the next day, changing the dates for Counts 1 and 2 to "on or about November 24, 2007."

A week later, Sellers served a motion for psychological evaluation of M.R.C. on the State. In his motion, Sellers argued that there was no evidence corroborating M.R.C.'s story. He further contended that M.R.C. had admitted that she was afraid Sellers' interest in her mother would interfere with her mother's affections

for her. Sellers also argued that M.R.C. had demonstrated a lack of veracity by giving investigators two different stories about the circumstances of the Thanksgiving touchings and by changing their date from November 17 to November 24.

At Sellers' second preliminary hearing on the first amended complaint, M.R.C. testified that her testimony at the first preliminary hearing was accurate except for the date underlying Count 1 and Count 2. M.R.C. testified that she had remembered a friend's birthday party the night of November 24, which helped her to identify the correct date. At the conclusion of the evidence in the second preliminary hearing, the district judge determined there was probable cause to believe the touching charged in Counts 1 and 2 occurred on November 24.

The district judge also took up Sellers' motion for the psychological evaluation of M.R.C. at the second preliminary hearing. Sellers argued that M.R.C. did not tell anyone about the incidents until weeks after they occurred; that there was no corroborating evidence; that M.R.C. and Sellers were having a lot of problems and that M.R.C. had been worried Sellers would take her mother away; and that the first preliminary hearing supported a need for counseling for M.R.C. The State responded by reviewing factors outlined in *State v. Price*, 275 Kan. 78, 61 P.3d 676 (2003), contending that M.R.C. did not demonstrate mental instability; that she did not demonstrate a lack of veracity; that she had not made similar charges in the past; that Sellers' motion was merely a fishing expedition; that no other reasons existed to submit M.R.C. for evaluation; and that M.R.C. did not demonstrate difficulty with telling the truth. The district judge found M.R.C. credible, having seen her testify at both preliminary hearings. The judge also found that Sellers overstated the friction between himself and M.R.C. and that there was no history of mental instability on the part of M.R.C. The judge thus denied Sellers' motion.

Sellers also filed a pretrial motion to the dismiss the charges, arguing that K.S.A. 21-3504(a)(3)(A) and the life imprisonment punishment of Jessica's Law violated the Due Process and Equal Protection Clauses of the federal Constitution, as well as the federal and state constitutional prohibition on cruel and/or unusual

punishment. The district judge presumed the statutes were constitutional and denied the motion. Sellers also moved to dismiss either Count 1 or Count 2 as multiplicitous; the district judge took the motion under advisement.

*Trial and Sentencing*

At trial, the State called Yoder, M.R.C., Lowe, M.R.C.'s aunt, the mother of M.R.C.'s friend whose birthday party had been on November 24, 2007, and C.M. M.R.C. again testified to the events surrounding the Thanksgiving touchings and the Halloween touching. Her trial testimony about the Thanksgiving touchings was consistent with her statement to Yoder and her testimony at the first preliminary hearing, with the exception of the date being November 24 rather than about a week before. Cross-examination of M.R.C. established that she initially believed the Halloween touching to be an accident.

After the State rested, Sellers renewed his motion to dismiss arguing that Jessica's Law was unconstitutional and that Counts 1 and 2 were multiplicitous. The district judge rejected the Jessica's Law constitutional challenge and reserved ruling on the multiplicity issue.

The jury found Sellers guilty on Counts 1 and 2 for the Thanksgiving touchings and acquitted Sellers on Count 3 for the Halloween touching.

Sellers filed a motion for departure from the life sentence and mandatory 25-year minimum of Jessica's Law, arguing that he was a productive member of the community and a noncommissioned military officer with an excellent service record. Sellers also argued that there was little, if any, harm to the victim.

At his sentencing hearing, Sellers again argued that Counts 1 and 2 were multiplicitous. He also argued that the district court should grant him a new trial because the court should have ordered the psychological evaluation of M.R.C. The district judge rejected both arguments, ruling that the two acts of touching underlying Counts 1 and 2 were separate and that the second was motivated by a fresh impulse. The district judge also affirmed the previous

rejection of Sellers' argument that Jessica's Law was unconstitutional.

Sellers did receive a departure from the life sentence and 25-year mandatory minimum of Jessica's Law. The district judge handed down a 72-month sentence for Count 1 and a consecutive 59-month sentence for Count 2. The district judge also initially ordered 36 months' postrelease supervision. After going off the record briefly, the judge reopened the record and corrected the 36-month postrelease period to life. He also imposed lifetime electronic monitoring.

## ANALYSIS

### Psychological Evaluation of Victim

Sellers argues that the district judge erred in denying his motion for a psychological evaluation of M.R.C. On appeal, the State responds by saying that Sellers was unable to satisfy his burden to show the evaluation was compelled under *State v. Gregg*, 226 Kan. 481, 602 P.2d 85 (1979).

Our standard of review of the district judge's decision on such a motion is abuse of discretion. See *Price*, 275 Kan. at 80 (quoting *State v. Rucker*, 267 Kan. 816, 821, 987 P.2d 1080 [1999]). Discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. *Price*, 275 Kan. at 83 (citing *State v. Saiz*, 269 Kan. 657, 667, 7 P.3d 1214 [2000]).

Most recently, in *State v. Berriozabal*, 291 Kan. 568, 581, 243 P.3d 352 (2010), this court stated that the determination of whether compelling circumstances existed to support an order for a psychological evaluation requires an examination of the totality of the circumstances in the case, considering the following nonexclusive list of factors:

"(1) whether there was corroborating evidence of the complaining witness' version of the facts,

"(2) whether the complaining witness demonstrates mental instability,

"(3) whether the complaining witness demonstrates a lack of veracity,

"(4) whether similar charges by the complaining witness against others are proven to be false,

"(5) whether the defendant's motion for a psychological evaluation of the complaining witness appears to be a fishing expedition, and

"(6) whether the complaining witness provides an unusual response when questioned about his or her understanding of what it means to tell the truth."

Here, Sellers does not argue that the fourth, fifth, or sixth factors apply. He focuses his arguments on the first three factors, which we discuss in order below.

On the first factor, corroboration, Sellers argues that there is little or no corroborating evidence in this case. Although we agree that M.R.C.'s repetition of her story to her aunt, her mother, and investigators was only repetition and did not qualify as corroboration in the strictest sense of the word, we note that the district judge's decision to deny the psychological evaluation came at the end of the second preliminary hearing. In that hearing, M.R.C.'s mother testified that she confronted Sellers with M.R.C.'s allegations, and he responded that M.R.C. had given him access to her breasts and moved her hips. Further, when M.R.C.'s mother asked Sellers why he had touched M.R.C., she reported that he had said, "I don't know[;] I'm sick[;] maybe I like them like that." M.R.C.'s mother's testimony also supported peripheral details from M.R.C.'s recitation of her memories from the critical Thanksgiving 2007 weekend. For example, C.M. testified that she lay down for a nap that weekend and that M.R.C. and Sellers eventually joined her on the bed.

Regarding mental instability, Sellers relies in part on M.R.C.'s conflict with him and with her mother. To the extent he does so, a reasonable person could certainly conclude that he is unrealistic in his expectation of constant adolescent equanimity. Heated disagreements between adults and teenagers are more a norm than an aberration; and the existence of such disagreements, without more, does not demonstrate mental instability on the part of the teenagers. M.R.C.'s testimony at trial that her mother had suggested counseling for herself, her mother, and Sellers also does not make a compelling case for teenage mental instability. And we note

that the suggestion that M.R.C. could benefit from counseling orig-
inated with defense counsel at the first preliminary hearing.

Also in support of the second factor, Sellers asserts that M.R.C.
may have been bipolar, but this assertion is nothing more than rank
speculation. M.R.C.'s aunt testified at trial that bipolar disorder
ran in M.R.C.'s family, and there was discussion during the first
preliminary hearing of M.R.C.'s mother's depression upon return
from her military deployment. There is no testimony anywhere in
the record that M.R.C. was ever tested for or diagnosed with this
potentially serious mental illness. The mental instability factor de-
mands "demonstrable evidence of a mental condition that requires
further investigation, not the mere allegation of some untoward
mental condition." *Berriozabal*, 291 Kan. at 581.

As to the third factor, lack of veracity, Sellers points to two in-
consistencies in M.R.C.'s versions of the Thanksgiving touching.

First, he relies upon M.R.C.'s change of date—from the Satur-
day *before* Thanksgiving 2007 to the Saturday *after* Thanksgiving
2007—which followed his service of notice of an alibi defense for
the first date. Second, he relies upon M.R.C.'s initial statement to
Lowe that she and Sellers were alone on the Thanksgiving weekend
when Sellers simply walked up to her and touched her, as com-
pared to her statement to Yoder and repeated later testimony that
she was on her mother's bed with her mother when Sellers touched
her.

The district judge made findings that guide our view of each of
these inconsistencies, and the record on appeal supplies vital ad-
ditional information.

On the date change, the district judge found that M.R.C.'s
mother first suggested the November 17 date and that, upon
M.R.C.'s further reflection, the date was corrected to November
24. From this finding and the totality of circumstances revealed by
the remainder of the record on appeal, it is apparent that M.R.C.
was eventually able to pinpoint the date exactly because she re-
membered additional details about the weekend after Thanksgiv-
ing, including the visit of a friend from out of town.

With regard to the second inconsistency, the district judge found
that M.R.C. testified clearly about the circumstances surrounding

the Thanksgiving touching and who was present. We also note that the record reflects Lowe's pertinent characterization of his task in interviewing M.R.C. He testified that he merely took an initial report from M.R.C. and avoided getting too many specific details so that she could tell her story to a detective. In other words, Lowe's mission was limited. His interview was designed only to determine whether there was an allegation that a crime occurred before referring the case to an investigator. He employed "yes or no" and leading questions to get the necessary information because M.R.C. did not volunteer information herself. The single inconsistency between the story told to him and the subsequent story may have been an artifact of varying interview techniques.

Our *Price* case considered an allegation of lack of veracity of a complaining witness and noted that the issue was whether the alleged untruthfulness related to the victim's contact with the defendant. *Price*, 275 Kan. at 88. Here, the inconsistencies Sellers relies upon do relate to M.R.C.'s contact with him. However, a reasonable person could regard the two inconsistencies at issue here as isolated or "occasional" rather than indicative of general lack of veracity such that a psychological examination was compelled. See *Berriozabal*, 291 Kan. 568, Syl. ¶ 6 (merely occasional inconsistent statements by complaining witness do not compel psychological evaluation). We are also appropriately mindful that the district judge, who found no indication of lack of veracity on M.R.C.'s part, had the advantage of observing her demeanor on the witness stand. We, of course, do not.

Having fully reviewed and considered Sellers' arguments on the three factors relevant to this issue, we hold that the district judge did not abuse his discretion in denying the motion for a psychological evaluation of M.R.C. Sellers did not meet his burden to demonstrate a compelling need for such an evaluation, under the totality of circumstances present in this case.

*Multiplicity*

The issue of multiplicity is a question of law, and this court's review is unlimited. *State v. Appleby*, 289 Kan. 1017, 1026, 221 P.3d 525 (2009) (citing to *State v. Thompson*, 287 Kan. 238, 243,

200 P.3d 22 [2009]); *State v. McCarley*, 287 Kan. 167, 177, 195 P.3d 230 (2008). In addition, questions of statutory interpretation and construction, on which multiplicity turns, are reviewed de novo on appeal.

"When reviewing a statute, an appellate court first attempts to give effect to the intent of the legislature as expressed. When the language of a statute is plain and unambiguous, the court must give effect to that language, rather than determine what the law should or should not be. The court will not speculate as to legislative intent or read such a statute to add something not readily found in it. *State v. Harris*, 284 Kan. 560, 572, 162 P.3d 28 (2007); *State v. Post*, 279 Kan. 664, 666, 112 P.3d 116 (2005). The court will not resort to canons of statutory construction or consult legislative history if the language of a statute is clear and unambiguous as written. See *State v. Robinson*, 281 Kan. 538, 539-40, 132 P.3d 934 (2006)." *Thompson*, 287 Kan. at 243-44.

Sellers argues that Counts 1 and 2 arise from the same conduct and are thus multiplicitous. The State responds that there was a break between the touchings of M.R.C.'s breasts and pubic area and thus the conduct was not unitary. In the State's view, a fresh impulse supported charging the touchings in two counts.

This court has defined multiplicity as " 'the charging of a single offense in several counts of a complaint or information.' " *State v. Schoonover*, 281 Kan. 453, 475, 133 P.3d 48 (2006). A two-prong test determines whether convictions are for the same offense: " '(1) Do the convictions arise from the same conduct and, if so, (2) by statutory definition are there two offenses or only one?' " *Thompson*, 287 Kan. at 244 (quoting *Schoonover*, 281 Kan. at 496). If the convictions are not based upon the same, or unitary, conduct under the first prong, then the analysis ends. *Thompson*, 287 Kan. at 244.

Our decision in *Schoonover* provided four guiding factors on the first prong:

"(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." *Schoonover*, 281 Kan. at 497.

Sellers believes that the charged acts were part of a single, continuous behavior. The State relies upon Sellers' exit from the room

to check on the dog as a break in the action with significance to the third and fourth factor.

The district judge conceded that this case was a close one on the facts, but he ruled that the exit from the room justified the State's decision to charge two crimes. He determined that Sellers had to make a conscious decision to reoffend when he came back into the bedroom and was motivated by a fresh impulse.

The sequence of events underlying Counts 1 and 2 occurred as follows, according to M.R.C.'s trial testimony:

M.R.C. and her mother lay down on her mother's bed in her mother's room. M.R.C. was on the right and her mother was on the left. They were lying with their heads on the pillows, and M.R.C. was on her stomach, holding hands with her mother.

• Sellers lay down on his stomach between M.R.C. and her mother. Sellers was positioned on the bed so that his head was about waist-level with M.R.C. and her mother. Sellers puts his arm over M.R.C.'s legs.

• Sellers moved his right hand under M.R.C. and moved it up to her breast where he then moved his hand around.

• Sellers got up from the bed and left the room to check on the dog, who was making noise as though he was tearing up paper in the other room. Sellers was gone for 30 to 90 seconds.

• Sellers returned to the room and lay between M.R.C. and her mother again. He put his hand on the inside of M.R.C.'s left thigh and moved it up toward her pubic area. He reaches her "private part" and wiggled his fingers.

• Sellers stopped again and got up and walked around to M.R.C's mother's side of the bed to see if she was still sleeping.

• Sellers walked around to M.R.C.'s side of the bed and started to lift up her shirt.

• M.R.C. squeezed her mother's hand and woke her.

The first and second *Schoonover* factors—whether the acts occurred at or near the same time and in the same location—are clearly met in this case. The fondling of M.R.C.'s breast and the touching of her pubic area occurred within minutes of each other, both on the bed in her mother's room. The more difficult ques-

tions, as the parties realize, arise out of the third and fourth *Schoonover* factors—whether the break to check on the dog in another room was sufficient to constitute an intervening event and whether Sellers formulated a fresh impulse to reoffend in the time between leaving the room and returning to the bed.

This court has considered the question of multiplicity many times in sexual assault cases. In *State v. Dorsey*, 224 Kan. 152, 156, 578 P.2d 261 (1978), this court held that multiple acts of attempted rape over the course of about 45 minutes resulted in only one count of rape. But subsequent decisions have reached different results. See *State v. Richmond*, 250 Kan. 375, 378-79, 827 P.2d 743 (1992) (distinguishing *Dorsey*, holding two counts of rape not multiplicitous despite time frame similar to that in *Dorsey*); *State v. Zamora*, 247 Kan. 684, 693-94, 697-98, 803 P.2d 568 (1990) (two rape charges not multiplicitous when digital penetration preceded intercourse); *State v. Howard*, 243 Kan. 699, 703-04, 763 P.2d 607 (1988) (multiple counts of rape, sodomy not multiplicitous when occurring over span of 90 minutes to 3 hours; when separate, distinct; when occurring in different locations in house; when separated from each other by other sex acts); *State v. Wood*, 235 Kan. 915, 920, 686 P.2d 128 (1988) (incidents of sexual intercourse separate, distinct when separated by 2 to 3 hours).

However, in *State v. Potts*, 281 Kan. 863, 872, 135 P.3d 1054 (2006), this court held that a short break between events did not demonstrate the existence of a fresh impulse. We said:

"Although the defendant calmed down momentarily when he laid down on the bed, the record suggests that only a few minutes went by before he told V.H. to perform oral sex on him. All of the acts seemingly stemmed from V.H.'s refusal of Potts' sexual advances, and the evidence does not demonstrate a fresh impulse motivating some of the conduct. Rather, the evidence demonstrates that the charges arose out of the same continuous transaction involving Potts' violent reaction to V.H. repeatedly refusing his sexual advances." *Potts*, 281 Kan. at 872.

As the district judge noted, this case is a close call. The sequence of events is subject to the interpretation that Sellers checked on the dog, and, for that matter, on the continuing slumber of M.R.C.'s mother, to ensure that no noise impeded his overall plan to molest M.R.C. But he did leave the room for 30 to 90 seconds,

breaking the chain of causality and giving him an opportunity to reconsider his felonious course of action. The district judge ultimately determined that Sellers had to make a second conscious decision to touch M.R.C., and, acknowledging the difficulty of this call, we agree. The conduct underlying Counts 1 and 2 was not unitary, and our multiplicity analysis ends here.

*Constitutionality of Lifetime Postrelease Supervision*

Sellers argues on appeal that the imposition of mandatory lifetime postrelease supervision under Jessica's Law violated the Eighth Amendment to the United States Constitution and § 9 of the Kansas Constitution Bill of Rights because it constitutes cruel and unusual punishment. We do not reach this issue because it is not preserved for our review.

"Ordinarily, constitutional challenges to a statute raise questions of law subject to unlimited appellate review." *State v. Seward*, 289 Kan. 715, 718, 217 P.3d 443 (2009). But constitutional claims must be preserved for appeal by advancement and argument in the district court. See, *e.g.*, *State v. Thomas*, 288 Kan. 157, 160-61, 199 P.3d 1265 (2008); *State v. Ortega-Cadelan*, 287 Kan. 157, 161, 194 P.3d 1195 (2008).

Sellers thoroughly preserved the issue of whether the life sentence and mandatory minimum of Jessica's Law violated the federal or state constitutions before the district court. He filed a pretrial motion to dismiss; argued the issue at the opening of trial; renewed his claim to dismissal on the issue at the close of trial; and, finally, challenged those aspects of Jessica's Law at his sentencing hearing. But all of that careful preservation was aimed at unrealized threats. When the district judge sentenced Sellers, he departed from the life sentence and mandatory minimum of Jessica's Law to the non-drug grid under the sentencing guidelines, as he was expressly permitted to do under K.S.A. 21-4643(d). See also *State v. Spencer*, 291 Kan. 796, 248 P.3d 256 (2011) (discussing departures from Jessica's Law, further departures from sentencing grid imprisonment ranges).

Sellers simply never raised a challenge to the constitutionality of lifetime postrelease supervision under Jessica's Law in the district

court. We therefore do not reach the unpreserved issue on this direct appeal.

*Lifetime Postrelease Supervision v. 36-Month Term*

Sellers next challenges the district judge's ability to impose a lifetime postrelease supervision term because he believes the district judge lost jurisdiction to impose increased punishment when the record of his sentencing hearing was briefly closed after initial pronouncement of a 36-month postrelease term. In Sellers' view, his situation also is distinct from that of the Jessica's Law defendant in *State v. Ballard*, 289 Kan. 1000, 218 P.3d 432 (2009), in which we affirmed a district judge's correction of an illegal 36-month postrelease term to a lifetime term, even though 2 weeks had passed between the original imposition and the correction. See *Ballard*, 289 Kan. at 1012. The defendant in *Ballard* had entered a no contest plea. Sellers, on the other hand, went to trial, putting every element of the State's case in issue. This is a distinction with a difference, he argues, because the State failed to prove that he was 18 or older at the time of his crimes. Thus, under *State v. Bello*, 289 Kan. 191, 199-200, 211 P.3d 139 (2009), and its progeny, he cannot be subjected to punishment for an off-grid Jessica's Law offense, including lifetime postrelease.

We exercise unlimited review over jurisdictional questions. See *Bello*, 289 Kan. at 195-96. Also, to the extent this issue requires us to determine the statutorily authorized postrelease term for off-grid and the grid form of aggravated indecent liberties with a child, we exercise unlimited review. See *Ballard*, 289 Kan. at 1010 (citing *State v. Storey*, 286 Kan. 7, 9-10, 179 P.3d 1137 [2008]).

Sellers is correct that a defendant's age of 18 or older is an element of the off-grid Jessica's Law aggravated indecent liberties charged in Counts 1 and 2. See K.S.A. 21-3504(a)(3)(A); K.S.A. 21-3504(c) (aggravated indecent liberties with child as described in subsection [a][3] is a sentencing grid severity level 3 person felony unless offender 18 years of age or older; if offender 18 or older, then aggravated indecent liberties with child as described in subsection [a][3] is an off-grid person felony).

We have excused the State from charging and ensuring jury instruction on the element of a Jessica's Law defendant's age only when evidence in the trial record has left no doubt that the omissions made no practical difference in the verdict. See *State v. Reyna*, 290 Kan. 666, 234 P.3d 761 (2010); *State v. Colston*, 290 Kan. 952, 235 P.3d 1234 (2010). When there has been no such evidence, we have not been so sanguine. Rather, we have held that the defendant can be exposed to punishment only for the grid form of the crime. See *Bello*, 289 Kan. at 200; *State v. Morningstar*, 289 Kan. 488, 213 P.3d 1045 (2009); *State v. Gonzales*, 289 Kan. 351, 212 P.3d 215 (2009).

In this case, the charging document did not allege that Sellers was 18 or older at the time of the crimes; it did list his year of birth as 1971. There was no evidence of Sellers' age admitted at trial, other than whatever circumstantial weight could be given to passing mention of his military service with M.R.C.'s mother. The jury instructions on the elements of the aggravated indecent liberties offenses charged in Counts 1 and 2 did not inform jurors that they must agree that Sellers was 18 or older when he molested M.R.C.

At Sellers' sentencing hearing, the district judge initially imposed a 36-month postrelease supervision term and then went off the record. After what appears to be at most a few minutes, the judge reopened the record and changed the postrelease supervision period to lifetime, stating that he had made a mistake in his initial pronouncement.

A judgment generally is effective upon pronouncement from the bench, and, once imposed, a sentence cannot be increased by the court. See *State v. Miller*, 260 Kan. 892, 900, 926 P.2d 652 (1996). In *Ballard*, despite the passage of 2 weeks between pronouncement of a 36-month postrelease term and correction to lifetime postrelease, we did not apply this general rule because a court may correct an illegal sentence that fails to conform to the governing statutory provision at any time under K.S.A. 22-3504. We held that a 36-month postrelease term for an off-grid Jessica's Law offense would have been illegal, even though the district judge had, under K.S.A. 21-4643(d), departed to the sentencing grid from the usual life sentence and mandatory minimum. *Ballard*, 289 Kan. at 1012

(nature of sexually violent off-grid crime not changed by departure; defendant therefore could only be subject to lifetime postrelease under K.S.A. 22-3717[d][1][G], rather 36-month postrelease under K.S.A. 22-3717[d][1][A]).

In this case, we are not sure that the general rule on effectiveness of a judgment upon pronouncement would compel us to vacate Sellers' lifetime postrelease term in favor of a 36-month term. The district judge's brief closure of the record makes us doubtful. But Sellers' lifetime postrelease term must be vacated in any event. An illegal sentence may be challenged at any time, and his lifetime postrelease term is illegal. Given the State's failure to prove Sellers' age at the time of his crimes, he cannot be subject to lifetime postrelease under K.S.A. 22-3717(d)(1)(G). Rather, he is subject only to the punishment tied to the grid form of aggravated indecent liberties; and that means a 36-month postrelease term under K.S.A. 22-3717(d)(1)(A).

*Lifetime Electronic Monitoring*

Sellers' last argument on this appeal focuses on the propriety of the district judge's specification that he be subject to lifetime electronic monitoring. Because his lifetime postrelease term must be vacated and the case remanded for replacement of the lifetime postrelease term with a 36-month postrelease term, the electronic monitoring element of Sellers' sentence also must be vacated. On remand, the district judge who resentences Sellers will have the benefit of our intervening decision in *State v. Jolly*, 291 Kan. 842, 249 P.3d 421 (2011), which discusses electronic monitoring and the entity with the authority to impose it. See *Jolly*, 291 Kan. at 848; see also K.S.A. 22-3717(u) (lifetime monitoring associated with parole rather than postrelease); K.S.A. 21-4703(p) (Parole Board has authority to set conditions for postrelease).

CONCLUSION

In view of all of the discussion above, defendant Sellers' convictions for aggravated indecent liberties are affirmed. The lifetime postrelease and lifetime electronic monitoring portions of his sen-

tence are vacated, and the case remanded for further proceedings consistent with this opinion.

Convictions affirmed; sentence vacated in part; and case remanded with directions.

* * *

JOHNSON, J., dissenting: I respectfully dissent on the multiplicity issue. I cannot discern either an intervening event or a fresh impulse to justify two convictions for the single offense. The defendant embarked upon the singular act of fondling M.R.C., notwithstanding momentary pauses to quiet the dog and to check that the coast was still clear.

Even accepting the characterization that this is a "close call," I would not find that the tie goes to the State. The State has the burden of proving guilt beyond a reasonable doubt. It should not win the toss-ups, especially when the consequence is the potential for a hard 25 life sentence. I would find that the two convictions were multiplicitous.