NOT DESIGNATED FOR PUBLICATION

No. 123,687

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSHUA F. SINNARD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; JAMES R. MCCABRIA, judge. Opinion filed October 7, 2022. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Jon Simpson*, assistant district attorney, *Suzanne Valdez*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HURST, P.J., HILL and ATCHESON, JJ.

PER CURIAM: In this direct appeal of his conviction for commercial sexual exploitation of a child, Joshua F. Sinnard claims he was denied a speedy trial. After reviewing the record and considering the arguments of the parties, we hold that the trial court properly used the crowded docket exception to the 180-day rule and held the trial timely. He also raises several trial errors. We find but one trial error—a lack of foundation concerning the absence of certain entries in some business records. But that error was harmless because it did not affect the trial's outcome. Thus, we affirm Sinnard's conviction.

*Some people exploit teenagers.*

On July 25, 2017, a 17-year-old girl, P.F., wanted to go to Legends Outlets retail district in Kansas City, Kansas. But the problem was how to get there from the Tonganoxie Public Library. She had no money, no job, and no car.

But she had her cell phone.

Using her phone and an app called Snapchat, she contacted a Snapchat user called Wamma Jamma. P.F. received a message that said, "message me if you want to make $200." P.F. understood that message to mean she could have sex with someone and get paid $200.

P.F. got her $200 and a trip to Legends.

Soon after messaging Wamma Jamma, P.F.—again via Snapchat—received a message from someone called Blu. The messenger agreed to pick P.F. up at the library. Blu told her what kind of car he was driving and said that he was a male named Josh. Later police investigation revealed that he was the defendant Joshua F. Sinnard.

Josh picked P.F. up at the library, and she agreed to have sex with him for $200 if he would then drive her to Legends. He agreed and drove to Lawrence where they went to his apartment, had sexual intercourse, and he then drove P.F. to Legends. He gave her $200 during their trip. He dropped her off at Nebraska Furniture Mart.

At this time, P.F. met a friend. They spent the rest of the afternoon and evening together at Legends. During the evening, P.F. bought underwear at Victoria's Secret. She paid with some of the money she got from Josh. A friend of her friend drove P.F. back to

2

her home in Tonganoxie in exchange for the last of the money she had received from Josh.

The bag from Victoria's Secret was a clue. She argued with her mother. Eventually, through coaxing, P.F. revealed all of the details of her day to her mother. When her father later heard, P.F.'s mother told the police.

Sinnard was charged and convicted by a jury of one count of commercial sexual exploitation of a child. He received a suspended 38-month prison sentence with lifetime postrelease supervision.

Basically, the trial consisted of the testimony of P.F. and then evidence from her mother and the investigating officer, Detective Scott Slifer, that corroborated her testimony.

Sinnard appeals, raising six issues:

1. The district court could not use the crowded docket exception to the 180-day trial rule.
2. Detective Slifer testified about subjects outside of his training and experience and introduced improper hearsay evidence that also lacked foundation.
3. The trial court should have granted a mistrial over P.F.'s mother's statement, "No. Because it took me some time to get the rest of the information out as far as, you know, um, *that it wasn't just her*." (Emphasis added.)
4. There was an improper jury instruction.
5. The trial court erred by not ordering a psychological evaluation of P.F.
6. Cumulative error.

3

*We find no violation of the speedy trial rule.*

One of the most troublesome tasks for a busy trial court is setting jury trials—especially in our urban districts—where the dockets are crowded. There are not enough available trial dates to accommodate all of the cases. But experience teaches us that for many reasons, trials are not often held on the original trial date. This is why the practice of stacking several trials, one on top of another all on the same day, arose in the hope that at least one of the cases would be tried if those other cases are settled or continued. Thus, a system of setting, continuing, and then resetting jury trials has become the standard way trials are scheduled. The only logical and practical officer to take charge of such a system must be the trial court itself. This is why the law treats such scheduling decisions as a matter of discretion. A busy trial court must have the freedom to manage its own calendar and schedule several trials to ensure that all parties—not just those connected in one case—may have speedy justice.

This case is an example of that system of setting—continuing—and resetting of jury trials. Sinnard's statutory speedy trial deadline was October 19, 2019. His trial was originally set for July 29, 2019. It was the second case set on that date, behind *State v. Ross*. Because *Ross* was believed to be ready to go, the court moved Sinnard's trial. The court noted that its docket was crowded. The court stated it had a week-long rape trial the next week, stacked jury trials the week after, and a three-week jury trial soon after that. The court offered October 28, November 4, and November 12 as possible dates. There were already trials scheduled on each of those dates. The parties agreed on October 28, 2019. There was another case set in the number one spot on that date—*State v. Potts*. Sinnard waived his right to a speedy trial from October 19, 2019, to October 28, 2019.

But on the morning of July 29, 2019, *Ross* was continued because of defense counsel's illness. To accommodate the witnesses' schedules in *Ross*, the trial court moved it to the number one spot on October 28, 2019, thus bumping Sinnard's trial down the list

4

for that day. The State then moved to continue Sinnard's trial. Sinnard objected. The court found that its docket was "very crowded" and it was appropriate to prioritize *Ross* because it was a high-level felony rape case that had been moved twice. *Ross* had been pending longer than Sinnard's case. The court set November 12, 2019, as a back-up date for Sinnard's trial. Sinnard objected to the court's "crowded docket" finding because the docket was not crowded when the court first set his trial for October 28. The court stated it had no other options. The court continued Sinnard's trial to November 12, 2019.

Then, on November 7, 2019, Sinnard moved to continue his trial to January 21, 2020, because his attorney was not prepared due to that attorney's involvement in a federal jury trial. Sinnard waived his speedy trial right between then and January 21. This continuance does not affect our issue here because defendants may condition their waiver upon a date certain. See *State v. Shockley*, 314 Kan. 46, 55, 494 P.3d 832 (2021). Sinnard's initial waiver of the time between October 19 and October 28 did not waive his right to a speedy trial indefinitely. Our concern is the time between October 28, 2019, and November 12, 2019. That 16-day delay is the period for which Sinnard did not waive his speedy trial right.

Anyone charged with a crime and held on an appearance bond, as Sinnard was, must be brought to trial "within 180 days after arraignment on the charge," unless otherwise provided for in the statute. K.S.A. 2021 Supp. 22-3402(b). One reason the time for trial may be extended is "because of other cases pending for trial, the court does not have sufficient time to commence the trial of the case within the time fixed for trial by this section. Not more than one continuance of not more than 30 days may be ordered upon this ground." K.S.A. 2021 Supp. 22-3402(e)(4). This is known as the crowded docket exception to the speedy trial statute.

We agree with the court in *State v. Coburn*, 220 Kan. 750, 753, 556 P.2d 382 (1976), where it held that the crowded docket exception "was designed to accommodate

5

the conflicting demands of speedy justice and crowded court calendars. A specific time limit to begin the trial is fixed, but one continuance caused by calendar congestion is permitted, of up to 30 days beyond the limit."

*The trial court did what it had to do.*

Sinnard contends that the trial court in some way manufactured this crowded docket and thus erred when it made a "crowded docket" finding that led to a continuance of his trial. In Sinnard's view, the docket was not crowded when the court set his trial date. He contends "the court created the crowded docket at the State's request based on the State's preference to try another case ahead of [his]." He argues for a narrow reading of the crowded docket exception to the statutory speedy trial deadline.

The circumstances of this trial show the wisdom of the speedy trial law and the crowded docket exception. This exception is practical and accommodates the conflicting demands of crowded dockets and speedy trials.

The case that Sinnard complains about—the rape case—did not really bump Sinnard's trial because his case was always the second case set for trial that day. Sinnard suggests that it was improper for the court to set the rape case when it did because the defendant in that case had waived any speedy trial concerns. This argument ignores the fact that there are other people involved in a jury trial of that type—the victims, other witnesses, the trial attorneys, and court personnel. A trial judge setting trials must take all of those interests into account when setting the docket. That appears to be what happened here. A busy judge with a crowded docket made a scheduling decision after weighing all of the different conflicting interests involved. This is a discretionary decision that should be free from appellate interference. The trial court must be allowed to schedule its time.

Even though a trial court has flexibility to manage its crowded docket, the statute protects a defendant's speedy trial right. A trial court can only invoke the crowded docket exception once and the continuance cannot be longer than 30 days. This prevents abuse of the exception.

There is no abuse of discretion here.

*The detective's testimony did not exceed legal limits.*

Sinnard contends the trial court erred by allowing Detective Slifer to testify about cell phone technology that required expertise when he was not ruled to be an expert witness. Sinnard also complains about the admission of hearsay in the form of cell phone records that were admitted without a proper foundation.

Just before Detective Slifer testified, defense counsel asked for an order limiting the detective from testifying "about any sort of cell phone's technology about how calls ping off cell towers; why they wouldn't ping off certain cell towers; anything of that nature" because the detective had not been designated as an expert under K.S.A. 22-3212.

The trial court acknowledged the defense's concern and left the matter open, waiting to rule on specific objections:

> "Given the limited scope of what the State intends to ask, and with the representation that there will be no opinion offered as to the location, as far as addresses of any particular phone, but simply general testimony about training, experience of phones, cell phones generally ping off the nearest tower, and if that's the scope and limit of any testimony, the initial objection is overruled."

The court held that defense counsel could object if the detective's testimony started crossing the line into matters that would require expertise. Our search of the record

7

reveals that Sinnard objected twice to Slifer's testimony regarding cell phone tower location data. One of those objections was sustained and his testimony on that question was not considered by the jury.

Detective Slifer testified that he had over a thousand hours of training in examining computers, cell phones, and electronic devices for use in criminal investigations. In 2017, he was deputy director for the FBI's Heart of America Regional Computer Forensic Laboratory, but he still worked cases for the Lawrence Police Department as needed. He had knowledge through his training and experience about cell phone towers and cell phone detail records. Cell phone companies keep records of the date and time of cell phone calls and the tower that serviced the transaction. Slifer testified that "in general your cell phone wants to use or gets the strongest signal from the nearest cell phone tower" barring interference or a special event with a lot of people in one place.

Without objection, the court admitted three exhibits that Detective Slifer had received from T-Mobile. The exhibits contained

- the basic account details for the phone identifying Sinnard as the subscriber;
- a guide explaining how to read the call detail records; and
- a spreadsheet listing the calls made or received from Sinnard's phone on July 25, 2017, the time of the call, and the location of the cell phone tower that serviced the call.

Detective Slifer had obtained four weeks of phone records for Sinnard's phone (two weeks before and two weeks after the incident). Only the record for July 25, 2017, was admitted into evidence as an exhibit. Slifer repeated for the jury the facts found in the exhibit. On July 25, 2017, calls at 12:34 and 12:36 were serviced by a Tonganoxie

cell tower about 3.86 miles southeast of the Tonganoxie Public Library. The next calls at 2:02, 2:04, and 2:27 p.m. used a Kansas City, Kansas cell tower "very near the Legends." Calls at 2:36 and 2:38 again used the Tonganoxie cell tower. The remaining calls that day used cell towers located in Lawrence. Sinnard's phone did not use the Tonganoxie cell tower at any other time during the two weeks before or two weeks after July 25. Slifer did not testify about where Sinnard's phone was located when any of the calls were made or received.

Detective Slifer also explained, without objection, that the cell phone records only showed calls and traditional SMS text messages. From the records he obtained, the detective could not tell if the phone was in a different location but only being used on "data" or not being used at all. That limitation was also explained in Exhibit 4—the guide that T-Mobile had provided.

Defense counsel did not object during Detective Slifer's testimony that cell phones generally use the closest cell tower. But later in the detective's testimony, defense counsel objected when the detective referred to his earlier testimony that cell phones generally connect to the closest tower. The court overruled the objection.

This argument is a soft punch at best. Detective Slifer testified about two things. First, he testified that cell phones generally connect to the closest cell phone tower and gave reasons why a cell phone would not connect to the closest tower. In doing so, he offered no opinion about the coverage area of any cell phone tower or the location of Sinnard's phone.

Prior cases have concluded that this basic understanding of how cell phones and cell phone towers operate does not require expert testimony. Our Supreme Court addressed the issue in *State v. Timley*, 311 Kan. 944, 952-54, 469 P.3d 54 (2020). In *Timley*, Detective Broxterman testified about the relative position of Timley's phone

9

throughout the day of the crime. Broxterman plotted the trajectory of Timley's phone based on information he received from Sprint that included which cell tower and which side of the tower the cell phone had accessed. Broxterman testified that shortly before the crime, Timley's phone accessed a cell tower in Topeka that was 2.63 miles from the crime scene. According to Per Call Measurement Data provided by Sprint, Timley's phone was estimated to be 2.63 miles away from that same tower. He explained that the PCMD was merely an estimate used by engineers, rather than a definitive fact. He read the disclaimer provided by Sprint. 311 Kan. at 946.

Before *Timley*, our court had made similar rulings in *State v. Fleming*, No. 106,104, 2012 WL 4794560 (Kan. App. 2012) (unpublished opinion), and *State v. Smith-Parker*, No. 114,713, 2017 WL 5014898 (Kan. App. 2017) (unpublished opinion). A panel of this court again ruled that any witness lacking expertise could not testify about the exact location of a cell phone when it made or received a signal from a cell phone tower.

Here, Detective Slifer's testimony helped the jury understand the significance of the cell phone records he had obtained from T-Mobile. That is a subject well within his experience and training. We find no significant difference between Detective Slifer's testimony and Detective Broxterman's testimony that the Supreme Court approved in *Timley*. We hold that Detective Slifer possessed more than sufficient training and experience to testify on this subject in the same fashion as the officers in *Timley*, *Fleming*, and *Smith-Parker*.

The detective did not try to pinpoint Sinnard's phone's location but gave approximations instead. A lay person reading the call detail report and the accompanying guide could do the same thing. Those exhibits were admitted into evidence without objection. The *Timley* court approved of a much more detailed testimony than what Slifer gave about the cell phone records.

10

It is Sinnard's own cell phone records that show on that day, his cell phone had engaged with the tower at Tonganoxie, and then later with the tower near Legends which verified P.F.'s version of the events that day. The admission of the officer's nontechnical explanation of commonly understood cell phone technology was not reversible error.

*There is a lack of foundation in this record in one small area.*

We turn now to the second complaint Sinnard raises on this subject: the court admitted inadmissible hearsay. The detective had the T-Mobile records for the two weeks before and two weeks after Sinnard's meeting with P.F. He told the jury that those records do not show that Sinnard's cell phone pinged on the Tonganoxie or Legends cell towers other than on July 25. The cell phone records for those four weeks were not admitted into evidence.

Defense counsel objected on the ground of hearsay "if he's making his opinion based on records that were outside of the exhibit" when the detective testified that he obtained Sinnard's phone records to see if they reflected P.F.'s statement that he took her from Tonganoxie to Lawrence to Legends. Defense counsel again objected "based on making an opinion of records that are outside the scope of the exhibit" when the detective was asked if Sinnard's cell phone had a pattern of going to Tonganoxie. That objection was overruled. Detective Slifer testified that July 25, 2017, was the only time during the four-week period that Sinnard's phone used the Tonganoxie tower.

In essence, hearsay is "a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2021 Supp. 60-460. There is an exception for business records if certain conditions are shown by the testimony of the custodian or other qualified witness or by certification: "(1) They were made in the regular course of a business at or about the time of the act, condition or event recorded; and (2) the sources of information from which made and the method and

circumstances of their preparation were such as to indicate their trustworthiness." K.S.A. 2021 Supp. 60-460(m). Hand in glove with this exception, is another exception for the *absence* of an entry in a business record:

> "Evidence of the absence of a memorandum or record from the memoranda or records of a business of an asserted act, event or condition, to prove the nonoccurrence of the act or event, or the nonexistence of the condition, if the judge finds that it was the regular course of that business to make such memoranda of all such acts, events or conditions at the time thereof or within a reasonable time thereafter and to preserve them." K.S.A. 2021 Supp. 60-460(n).

But both exceptions require a court to find that the records are made in the regular course of business before they can be admitted into evidence. This is a foundational requirement that must be met.

Detective Slifer testified about the contents of the cell phone records that were not admitted into evidence. He testified the cell phone records showed that Sinnard's phone communicated with the Tonganoxie cell tower several times on July 25, 2017, and at no other times during the four-week period. Those records made out-of-court statements about which cell towers Sinnard's phone had used. Detective Slifer did not testify which cell towers were listed on the unadmitted cell records. Rather, he testified that the Tonganoxie tower was not on the list. Thus, the K.S.A. 60-460(n) exception applies—the absence of a record that should be there is proof that the event did not occur. In other words, by showing there were no pings, a juror could infer that no calls were made by Sinnard.

Our question then becomes: does the lack of foundation render the detective's testimony about the lack of entries in the T-Mobile records inadmissible and therefore reversible error?

12

There was error here. We find in the record no testimony from a T-Mobile employee and no affidavit of the records custodian who produced the records. The trial court made no express determination whether the phone records were made in the regular course of business or their trustworthiness. See *State v. Wilson*, 11 Kan. App. 2d 504, 511, 728 P.2d 1332 (1986). No one from the phone company testified that in the regular course of business the company would have made a record of every cell tower the phone used. See *State v. Cremer*, 234 Kan. 594, 603, 676 P.2d 59 (1984). Detective Slifer had some general knowledge about how cell phone companies keep these records, but it was not clear that he had the necessary specific knowledge of T-Mobile's record-keeping.

In our view, this error was harmless because it did not affect the outcome of the trial. See *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011). The inference that arises from the lack of any cell phone activity by Sinnard with those two towers for the two weeks before and two weeks after simply suggests a lack of calls. That inference does not add weight to or detract from P.F.'s statements. It is not incriminating to the point that it is reversible error. The incriminating part of Detective Slifer's testimony was that Sinnard's phone connected to the Tonganoxie tower and then the Kansas City tower at the times P.F. said they were in Tonganoxie and at Legends. The unchallenged exhibits displaying Sinnard's cell phone records corroborated P.F.'s testimony on those points.

We hold that the error is harmless.

*Denying a mistrial was not an error.*

Next, we must consider whether the trial court abused its discretion by denying Sinnard's motion for a mistrial. He asks us to reverse and remand for a new trial.

Sinnard moved for a mistrial after P.F.'s mother remarked, "it wasn't just her." He construed her remark as evidence of "other bad acts" that is inadmissible under the rule in

13

K.S.A. 60-455. Sinnard contends it was used as evidence to prove that since he had committed some prior crime or wrong, then he committed a crime this time. In his view, according to K.S.A. 22-3423(1)(c), the admission of this comment caused a fundamental failure in the proceedings that made it impossible to continue the trial without injustice.

During trial, the State asked P.F.'s mother how long it took her to report the incident to the police. Her reply contained the four words that Sinnard complains about:

"Q.    And then [P.F.] testified that she ended up having an interview with Detective Slifer. Do you recall how long between when you reported it, and that interview?

"A.    No. Because it took me some time to get the rest of the information out as far as, you know, um, that it wasn't just her.

"Q.    Um, so you tried to do some, maybe your own investigation with [P.F.]?

"A.    Yes, I did.

"Q.    Before she met with Detective Slifer?

"A.    That's how it pretty much started. Yes, I did."

Defense counsel then asked to approach the bench and moved for a mistrial. Counsel argued that P.F.'s mother had implied the evidence shows that Sinnard had committed another crime by saying "it wasn't just her." Both counsel knew that there was some discussion that P.F. was asked to find a 12-year-old girl for Sinnard, but the State had instructed P.F.'s mother not to bring that up.

The court ruled that it was "an ambiguous reference." The court did not know that there was evidence of another alleged victim and stated that based on "the context of what's been presented, and how the jury would interpret this" that it was unlikely the jury would deduce there were other victims. Rather, in context, the "it wasn't just her" statement seemed to refer to P.F.'s mother trying to figure out all the details of that day, and how the arrangement was made including any involvement of Jamma and her friend

14

she met at Legends. The court did not find any basis to grant a mistrial. The court admonished the witness that topic was off limits.

We wonder whether trial counsel may have seen a phantom of a 12-year-old girl here. It is true that "evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." K.S.A. 2021 Supp. 60-455(a). But it is not clear that evidence of the other crime would have been inadmissible under K.S.A. 60-455 if the State had sought to admit it. The evidence corroborated P.F.'s testimony that the charged crime had taken place and could have fit one of the statutory exceptions such as identity. See K.S.A. 2021 Supp. 60-455(b).

It is unclear from this record what prior crime or wrong P.F.'s mother may have been referring to, if indeed she was referring to such. These four words are ambiguous. The trial court was correct in its holding.

A trial court may order a mistrial any time it finds prejudicial conduct, in or outside the courtroom, that makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution. K.S.A. 22-3423(1)(c). When this law is used to move for a mistrial, we first determine whether the district court abused its discretion when deciding whether there was a fundamental failure in the proceeding. If so, then we determine whether the district court abused its discretion when deciding whether the conduct caused prejudice that could not be cured or mitigated through admonition or jury instruction, which resulted in an injustice. See *State v. Fraire*, 312 Kan. 786, 789, 481 P.3d 129 (2021).

We think the trial court handled this question very well. The court's decision was not unreasonable or an error of fact or law. One ambiguous remark that "it wasn't just

15

her" does not amount to a fundamental failure in the proceeding in this case. There was no other information presented for the jury to infer that Sinnard had other victims at other times. P.F.'s mother had just testified that it took a few days to pry out the details of what had happened on that particular day when she made the remark. The mother did not testify about anything that happened on another day.

The four words Sinnard complains about are not definite. The "it" and "her" were undefined. "Her" could have referred to Jamma since P.F. believed Jamma was a teenage girl. The mother's remark would not qualify as evidence that Sinnard committed a crime "on a specified occasion" under K.S.A. 60-455. See *State v. Richmond*, 289 Kan. 419, 427, 212 P.3d 165 (2009). It was too unspecific.

There was no reasonable probability that any error affected the trial's outcome considering the entire record. The court admonished the witness. Any violation of K.S.A. 60-455 was "minimal and cryptic." See *State v. Sims*, 308 Kan. 1488, 1498, 431 P.3d 288 (2018). Even if the jury construed the mother's testimony as meaning that P.F. told her mom that Sinnard had picked up another girl, that would not somehow make P.F. more credible in her testimony about what Sinnard had done to her. There was no evidence presented to support a claim that Sinnard had picked up another girl. The jury had to first find P.F. credible. With the charged crime, in contrast, there was corroborating evidence.

We find no reversible error here.

*There is no jury instruction error.*

Sinnard argues that the trial court erred by failing to instruct the jury that the State had to prove the defendant acted "knowingly." When we reviewed the trial court's instructions, we found that the court had, indeed, instructed the jury properly. Here is the complete instruction.

16

"The defendant is charged with commercial sexual exploitation of a child. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. The defendant hired P.M.F. by giving, offering, or agreeing to give, anything of value to any person.

2. The defendant hired P.M.F. to engage in sexual intercourse.

3. At the time of the act, P.M.F. was less than 18 years old. The State need not prove the defendant knew the child's age.

4. This act occurred on or about the 25th day of July 2017, in Douglas County, Kansas.

"Sexual Intercourse means any penetration of the female sex organ by the male sex organ. Any penetration, however slight, is sufficient to constitute sexual intercourse.

"*The State must prove that the defendant committed the crime knowingly.* A defendant acts knowingly when the defendant is aware of the circumstances in which he was acting." (Emphasis added.)

This is a correct statement of the law and the court gave this instruction to Sinnard's jury. During oral argument of this case, we asked Sinnard's counsel about this claim of error. We were told that the placement of the term "knowingly" should have been higher in the elements of the instruction—not down below.

We are more interested in what the jury was told and not the appearance of the instruction. The jury was clearly instructed that the defendant's actions had to have been done knowingly. This is a trivial claim by Sinnard. His jury was properly instructed.

*Did the court's pretrial refusal to order a mental examination of P.F. amount to reversible error?*

Before trial, Sinnard asked the court to order P.F. to undergo a psychological evaluation under the ruling in *State v. Gregg*, 226 Kan. 481, 602 P.2d 85 (1979). He argued:

- P.F.'s complaint was uncorroborated because there were no Snapchat records of the conversations P.F. had with Wamma Jamma and Blu;
- P.F. demonstrated a lack of veracity because she made inconsistent statements;
- P.F. appeared to be mentally unstable because she had seen psychologists throughout her life and she did not like parental authority; and
- the request was not a fishing expedition.

The State responded that

- Snapchat records are not routinely saved;
- it had a record of a Snapchat conversation that occurred on August 6, 2017, asking if P.F. again wanted to meet up with "Josh" but this time for $100;
- there was a later Snapchat conversation between P.F. and Sinnard, which was saved; and
- the descriptions P.F. gave of Josh, his apartment, and employment corroborated her account.

The trial court denied Sinnard's motion, finding P.F. "very credible." At the preliminary hearing she seemed intelligent and gave direct answers to questions, even if embarrassing. The court held that the alleged inconsistent statements were proper areas for cross-examination but did not warrant a psychological examination. They were more in the realm of an everyday rebellious teenager offering explanations to her mother when she was engaging in behavior of which her mother would not approve. The court found that evidence did corroborate P.F.'s accusation, including the cell phone tower pings, her description of his apartment, and that she had money when she was at Legends.

18

At the time, a trial court had the discretion to order a psychiatric examination of a complaining witness in a sex crime case if the defendant presented a compelling reason for such examination. *Gregg*, 226 Kan. at 489. (That is no longer the law. See K.S.A. 2021 Supp. 21-5112.) Our Supreme Court emphasized several points to ponder when considering a request for such an evaluation. To determine if a criminal defendant was entitled to a psychological evaluation of a witness, a court had to decide whether:

- There is corroborating evidence of the complaining witness' version of the facts;
- the complaining witness demonstrates mental instability;
- the complaining witness demonstrates a lack of veracity;
- similar charges by the complaining witness against others have been proven false;
- the motion for a psychological evaluation appears to be a fishing expedition;
- the complaining witness provides an unusual response when questioned about their understanding of what it means to tell the truth.

*State v. Ballou*, 310 Kan. 591, 615, 448 P.3d 479 (2019).

We are not persuaded that the trial court abused its discretion here. We are persuaded by the court's explanation that P.F.'s alleged inconsistent statements are what one would expect of a rebellious teenager engaged in conduct that her mother would not approve. This is not something for which a psychological examination was required.

Our Supreme Court has approved a similar analysis where a trial court reasoned that the veracity factor "required something more than 'what typically happens with adolescents when confronted with wrong-doing by their parents.'" *State v. Rojas-Marceleno*, 295 Kan. 525, 532, 285 P.3d 361 (2012). That a complaining witness has

19

made inconsistent statements does not compel a mental evaluation of the witness. *Berriozabal*, 291 Kan. 568, 581, 243 P.3d 352 (2010). The trial court did not abuse its discretion in evaluating P.F.'s veracity.

The trial court then listed several pieces of corroborating evidence, including the cell phone tower pings, P.F.'s ability to describe Sinnard's apartment, and that she had money when she was at Legends. Given that the defense was a complete denial, this evidence was compelling. But even if it were not, the lack of corroborating evidence alone would not be a compelling reason to justify a psychological evaluation. There is no explained connection between the amount of corroborating evidence in the case and P.F.'s mental stability. But see *Ballou*, 310 Kan. at 615.

We find no evidence that P.F. was mentally unstable. That a teenager does not like parental authority is not evidence of mental instability. See *State v. Sellers*, 292 Kan. 346, 354, 253 P.3d 20 (2011), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). P.F. did testify at the preliminary hearing that she had "seen many therapists." But that is the extent of the detail on this point. Merely seeing a therapist is not evidence of mental instability. *State v. Staples*, No. 114,717, 2016 WL 7430426, at *4 (Kan. App. 2016) (unpublished opinion).

Sinnard cites *State v. Bourassa*, 28 Kan. App. 2d 161, 166-67, 15 P.3d 835 (1999), in which this court held the trial court abused its discretion when it denied the defendant's request for a mental evaluation of the complaining witness. *Bourassa* is unlike this case. There, the 11-year-old victim was under psychological care for behavioral disorders, was taking Prozac, had accused her father of sexually molesting her, tended to soil herself, had mutilated two kittens, and her allegation was not corroborated by her sister, who was present.

20

Here, there was corroborating evidence of 17-year-old P.F.'s version of the facts, there was no evidence she was mentally unstable, she did not lack veracity, there was no evidence she had made similar allegations against others, and she understood what it meant to tell the truth. This motion was a fishing expedition.

There is no reversible error here.

*Cumulative Error*

Having found but one error and it was harmless, we see no reason to consider Sinnard's claim of cumulative error. See *Ballou*, 310 Kan. at 617.

Affirmed.