IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,356

STATE OF KANSAS,
*Appellee*,

v.

DARRIN D. HIRSH,
*Appellant*.

SYLLABUS BY THE COURT

1.

There are three components or essential elements of a claim under *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 1197, 10 L. Ed. 2d 215 (1963): (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.

2.

Under the test for materiality governing all categories of *Brady* violations, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

3.

The touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

1

confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

4.

The impeachment value of one word in a law enforcement disciplinary report not disclosed to the defendant until shortly before the close of his case was negligible and thus not "material" under *Brady*.

5.

Multiplicity may be considered for the first time on appeal in order to serve the ends of justice or to prevent a denial of fundamental rights.

6.

In analyzing a double jeopardy issue, the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation:  (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one? Under the first component, if the conduct is discrete, i.e., committed separately and severally, the convictions do not arise from the same offense and there is no double jeopardy violation. If the charges arise from the same act or transaction, the conduct is unitary and the second component must be analyzed to see if the convictions arise from the same offense. Under the second component, it must be determined whether the convictions arise from a single statute or from multiple statutes. If the double jeopardy issue arises from convictions for multiple violations of a single statute, the unit of prosecution test is applied.

7.

Factors considered to determine whether convictions arise from the same or "unitary" conduct, satisfying the first component of the *State v. Schoonover,* 281 Kan. 453, 133 P.3d 48 (2006), rubric, are: (1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct.

8.

The two threats made by the defendant to the victim—the first promising to kill her and the second promising to kill their children, after the victim begged defendant not to let the children see her—qualify as the same or unitary conduct but constitute two units of prosecution under the criminal threat statute. Two convictions based on the threats are not multiplicitous.

9.

A prosecutor's statement to a jury that the victim told the truth is error, but the prosecutor's single-sentence error did not affect the outcome of the trial in light of the whole record, which included ample impeachment evidence that was finally rejected by the jury.

10.

Allegations of juror misconduct trigger a progressive two-step inquiry to determine if either a mistrial or new trial is warranted: (1) whether juror misconduct occurred, and (2) if so, whether the misconduct substantially prejudiced the right to a fair trial, meaning whether the State can show beyond a reasonable doubt that the misconduct did not affect the trial's outcome.

3

11.

Jury misconduct does not occur when venire members do not respond to questions never asked during voir dire.

12.

Immaterial assumed error under *Brady* and an individually harmless prosecutorial error during closing argument do not compel reversal under the cumulative error doctrine in this case.

Appeal from Barton District Court; RON SVATY, judge. Opinion filed August 2, 2019. Judgment of the Court of Appeals is affirmed. Judgment of the district court is affirmed in part, reversed in part, and vacated in part, and the case is remanded for further proceedings.

*Samuel D. Schirer*, of Kansas Appellate Defender Office, argued the cause, and was on the briefs for appellant.

*Natalie A. Chalmers*, assistant solicitor general, argued the cause, and *Jodi Liftin*, assistant solicitor general, was with her on the briefs for appellee.

PER CURIAM: The State of Kansas charged Darrin Duane Hirsh with three felonies and five misdemeanors arising out of an incident in which he made threats toward his wife, Candice Hirsh, and their children. Candice did not report the incident officially to law enforcement until about a year after it occurred.

Hirsh was convicted of aggravated assault, two counts of criminal threat, and domestic battery. He was acquitted of two counts of witness intimidation and one count of violating a protective order and another count of violating a protective order was dismissed. The Court of Appeals affirmed his criminal threat and domestic battery convictions and sentences, reversed his aggravated assault conviction and vacated the

4

sentence for it, and remanded the case so that the aggravated assault charge could be tried again. *State v. Hirsh*, 54 Kan. App. 2d 705, 405 P.3d 41 (2017).

We granted Hirsh's petition for review advancing five issues: (1) violation of his right to timely disclosure of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), (2) multiplicity of his two convictions for criminal threat, (3) prosecutorial error, (4) erroneous refusal to recall the jury to explore the possibility of misconduct during voir dire, and (5) cumulative error. The State did not seek review of the Court of Appeals' conviction reversal, sentence vacation, and remand on the aggravated assault charge.

We affirm the Court of Appeals panel's decision, although we reject a portion of its reasoning on the *Brady* issue.

FACTUAL AND PROCEDURAL HISTORY

Because we identify more than one potential error in the prosecution of Hirsh and must therefore examine individual harmlessness and the cumulative error doctrine, a fairly comprehensive recitation of the facts and procedural steps leading to the outcomes in the district court and Court of Appeals is necessary.

Hirsh and Candice married in the late 1990s and had three children. By 2012 at the latest, the couple was at odds because Candice suspected Hirsh had developed more than a friendship with Ashley Martell. Martell was living in an apartment on the Hirsh family's property, and the apartment doubled as a workshop for Hirsh.

On the evening of March 12, 2013, Hirsh was in the workshop with Martell and others. One of the couple's sons was upset about something related to Martell, and

5

Candice asked Hirsh to come inside the house to speak with him about it. Hirsh did so and returned to the workshop. Because the son was still upset, Candice returned to the workshop and again asked Hirsh to speak to the son. Hirsh did not return to the house until about midnight, and Candice was angry. She confronted Hirsh in the kitchen about his relationship with Martell, and, according to Candice's testimony at trial, an intense fight broke out. The evidence on exactly what occurred during that fight varies in certain respects from telling to telling and from time to time.

On the night the fight occurred, once it had ended, Candice called her friend Stephanie Jacobs and Jacobs' husband, David. David had previously worked with Hirsh as a trooper with the Kansas Highway Patrol. Stephanie tried to persuade Candice to call the police. When Candice refused, Stephanie called Candice's father. Candice's father then went to the Hirsh's house.

When Candice's father arrived, Candice would later testify, instead of telling him that Hirsh attacked her physically, Candice told him that she and Hirsh had merely had a "verbal confrontation." She told her father that the Jacobses misunderstood her earlier report to them, because she was afraid that her "marriage would be over" and that Hirsh "would get in trouble."

The morning after the incident, Candice called her employment supervisor, Talaya Schwartz, and told her that she "had kicked [Hirsh] out." Candice also told Schwartz that she was not coming into work and would take the rest of the week off. However, Schwartz would later testify at trial that Candice did come into work that morning and appeared "obviously disheveled . . . like she hadn't slept at all, and [she] stated that [she and Hirsh] were having some issues and she didn't know what was going to happen." At that time, Candice did not tell Schwartz that Hirsh had physically attacked her, but she did say that "things between her and [Hirsh] had gotten physical."

6

Candice also went to see Stephanie and David that morning and again discussed what had happened the night before.

For about a year after the attack, Candice did not report it to the police.

Then, on March 10, 2014, prompted by a meeting with Schwartz about Candice's slipping work performance during the previous year, Candice finally told Schwartz that Hirsh had physically attacked her. Schwartz eventually would testify that she responded by telling Candice to leave her husband and call the police, but Candice "did not want any of that." Schwartz was more successful in persuading Candice to tell her parents.

Candice had a severe panic attack on the way to her parents' house, and Candice's mother drove her to the hospital. Schwartz met Candice's parents at the hospital and told them everything Candice had told her.

After leaving the hospital, Stephanie and Schwartz drove Candice to a crisis center, where she met Detective Sharon Wondra of the Barton County Sheriff's Department. Candice then told Wondra about Hirsh's actions on March 12, 2013, including that Hirsh had threatened her and their children and had put a gun to her head. By Candice's own later admission, she intermittently denied that these events happened multiple times throughout the investigation.

In reaction to her new knowledge of the attack, Schwartz called a relative of hers, Barton County Sheriff's Deputy Kyle Reed. She told Reed about the attack, and Reed decided that he would take Schwartz to speak with David. The three discussed what Hirsh had done a year earlier; Schwartz insisted that the incident needed to be reported.

David then called Lieutenant Steven Billinger, who worked for the Kansas Highway Patrol at that time, and let Schwartz speak with him.

Reed would later be disciplined by Undersheriff Bruce Green for misconduct because he acted outside the chain of command by taking Schwartz to speak with David. Green's report on the disciplinary action stated in relevant part: "Deputy Reed said that Schwartz reported that she was told by Candice that [Hirsh] had placed a pillow over her head and threate[ned] to shoot her with a firearm in the *basement* of their residence." (Emphasis added.) The Kansas Bureau of Investigation (KBI) initiated an investigation into the attack when the Barton County Sheriff's Office sought its assistance. Green did not tell the KBI or the prosecutor about the existence of his report or its content.

At trial, during voir dire, after being asked what the phrase "domestic violence" meant to her, a potential juror volunteered information that her daughter had been the victim of domestic violence. In addition, among other things, potential jurors were asked:

"[PROSECUTOR]: Okay. Anyone else? When I say the words 'domestic violence,' does that mean anything in particular to you? Okay. As with everything, the law has defined it, so I'm going to read that to you. The State—the law defines domestic violence as an act or threatened act of violence against a person with [a] qualifying relationship, meaning they have some kind of a relationship that makes it domestic. Does anyone disagree with this definition? I see no response. If the court instructs you that this is domestic violence, an act or threatened act of violence, does anyone feel like they cannot follow the instructions? Okay. I see no response. Does anyone here believe that domestic violence happens? Okay. I see some heads nodding.

. . . .

"[PROSECUTOR]: . . . Before I sit down, as we have gone through the question[s] over the last hour and a half or so, is there anything that kind of struck you

8

that I need to tell her this? Because this is the last chance I have to talk to you about whether you're a fair or impartial juror. Anybody thinking back saying, you know what, I should probably say something about this? Okay. I see no response.

. . . .

"[DEFENSE COUNSEL]: . . . [S]ome of these allegations are domestic violence allegations. Anybody feel, by virtue of their experiences, their past, or you know, past experience of a loved one that they can't sit fairly and impartially on this jury? Everybody feels that they can put aside—I mean, the government, the State, Ms. Domme asked the questions earlier. . . . Does everybody feel that they can put aside and sit fairly and impartially on this jury if they're chosen?"

C.C., L.S., and D.H., who were eventually selected to serve on Hirsh's jury, did not respond to these remarks and questions from counsel or to other references to domestic violence during other parts of the voir dire. None of them told the attorneys for the parties during voir dire that they had experienced domestic violence.

Candice testified at trial that, on the night of the attack, she had told Hirsh to "get his stuff and get his girlfriend and get out of [the] house and never come back." This "enraged" Hirsh and he became violent.

According to Candice, Hirsh pushed her; "dragged her by [her] hair through the dining room"; and threw her into the living room, where she landed on the carpet, causing rug burns on her arms. The attack then moved to a hallway, where Hirsh pinned her against a wall and began choking her. Before the choking caused Candice to pass out, Hirsh let her go. Candice then went into one of their boys' bedrooms, where she sat on the edge of the bed and kept her cellphone close, in case she needed to call the police. Hirsh soon came into the bedroom. Candice told the jury that he appeared calm, was looking at her but not saying anything, and had something behind his back. He then pinned her to

9

the bed, straddling her, and laid a gun next to her head. Next he placed a pillow over her face and tried to suffocate her.

At first, Candice testified, she thought this behavior was a joke; she believed Hirsh was simply trying to get her attention and make his point that she should leave him alone. But she came to realize that she "was going to die." Hirsh said, "[I]t will all be over soon," and Candice said, "[D]on't let the boys see me like this." Hirsh responded by saying, "[T]hey will be going too." During this exchange, Candice told the jury, Hirsh had put the barrel of the gun to her head. He then got up suddenly and walked out of the bedroom. Candice, shocked, initially remained on the bed and then left the room to check on the children.

Candice also testified that she had denied her allegations against Hirsh after she first told the police about them because Hirsh specifically told her to "recant." She understood this to mean "[t]ake back what you had said . . . that I didn't mean it or take back what I had said about the gun incident." Candice also admitted that she had told Hirsh's Highway Patrol superiors, that is, Hirsh's captain and Billinger, that she and Hirsh merely had a verbal confrontation; she said she had done so at Hirsh's request. Candice also testified that she told investigators from the KBI that the incident never happened and that she had made it up because she was taking Ativan. Candice also had sent letters to Hirsh in the days after the attack to attempt a reconciliation with him. In the letters, Candice "den[ied] the gun incident." But Candice testified that she had written the letters at Hirsh's direction to try to make "this all go away" and said that Hirsh had made threatening statements in various text messages to her.

Finally, Candice also testified that, at one point in 2011 or 2012, Hirsh had threatened to kill himself in front of her. Specifically, Hirsh put a gun to his own head and told Candice that she was going to watch him shoot himself.

10

Martell testified that she and Hirsh were in the basement of the Hirsh house the night of the fight when Candice asked Hirsh to come upstairs. Martell stayed in the basement and after a few minutes heard the couple arguing. After she heard Candice tell Hirsh to get his things and get out of the house, she waited a few minutes and then went upstairs and left the house. Martell also told the jury that the couple was still arguing when she left; she could not recall anything else that they were saying. She did not go into the bedroom Candice described before leaving.

According to Stephanie, Candice was "hysterical" when she called on the night of the attack. Candice told her that she and Hirsh had a physical, violent fight that blossomed from an argument about Martell. Candice said then that the fight started in the kitchen and that "he drug her in to the bedroom and threw her onto the bed." Stephanie also testified that Candice told her about how Hirsh attempted to use a pillow to suffocate her and that he had threatened the children.

The morning after, according to Stephanie, Candice told her about the gun. When Candice came to the Jacobses' house, Stephanie saw "marks around" Candice's neck that were "reddish" and "purplish" and marks on her arms and back. This portion of Stephanie's testimony echoed Candice's account to the jury. Stephanie also testified that Candice told her and David that Hirsh used a pillow and that he "held a gun to the pillow to [her] head." Stephanie said that she told Candice to contact the police and that David needed to report the incident because he worked in law enforcement.

David testified at trial that Candice told him "'[Hirsh] beat the hell out of me.'" She reported that Hirsh threw her up against a wall, "put a pillow over her head[,] and put a gun to her head." Candice "said [Hirsh] told her to be quiet, it would be over with soon, and Candice said she asked him what about the kids, and Candice said [Hirsh] told her

11

the kids were next." David also said that he saw marks that "were kind of a reddish color turning into a bluish color like bruises" on her arms, and that "she had the same type of marks in kind of a half circle around her neck." Candice told David that Hirsh had given her the marks during the fight. Although David begged her to report the fight to the police, Candice refused. David also testified that he told Billinger about the attack after Candice left his house, leaving nothing out of his account.

Schwartz' trial testimony included a description of Candice telling her that Hirsh went "berserk," choked her, "dragged her across the room by her hair," and pinned her down in the bedroom. Candice told Schwartz that Hirsh "had a pillow over her face so she couldn't hardly breathe, and then he put a handgun to her head." Schwartz also testified that Candice said she pleaded with Hirsh not to let the children see her like that, to which he replied, "['][W]ell, you don't have to worry about that, they will be right behind you,['] or something like that."

The jury also heard from an expert witness for the State, Dorthy Stucky Halley, the Director of the Victim Services Division in the Office of the Attorney General. Halley testified that it is "very common" for domestic violence victims to recant truthful allegations.

Wondra also testified in the State and the defense case. According to her testimony, Candice initially said "nothing happened" between her and Hirsh, but she eventually disclosed details of the attack. Laura Patzner from the crisis center and Schwartz stayed in the room throughout Wondra's initial interview of Candice; Candice repeatedly looked at them; and Patzner directed Candice to answer Wondra's questions. However, Wondra said, there was no indication that Patzner told Candice the answers to give. Wondra did confess to doubts about the "integrity" of this interview because she

12

thought Candice was not telling her everything she knew. She also told the jury that Candice admitted to hitting Hirsh on at least one occasion.

The rest of the defense case consisted of six character witnesses. Each of the character witnesses testified to Hirsh being a calm, peaceful person.

One of the defense witnesses was Green, who testified on a Friday. During his cross-examination by the State, Green was asked about a document he had brought to the witness stand with him. He testified that it was the disciplinary report on Reed. Neither the prosecutor nor defense counsel was previously aware of the report. After a short recess to allow the parties to read and make copies of the report, Green's cross-examination continued without any other reference to it. There was no redirect examination by the defense. Neither party sought to admit the report into evidence. The following court day, Monday, the defense rested its case without objecting to Green's reference to the report or moving for mistrial based on its late disclosure.

During closing arguments, the prosecutor said:

"You get to determine the weight and credit to be given the testimony of each witness. Consider the trauma. Consider the dynamics. Consider the defendant's position in law enforcement.

"What was Candice's motivation? She came in here and told you it happened. . . . Candice comes in here and tells you what happened. She wasn't out to get [Hirsh]. She wasn't out to ruin him. She wasn't out to get rid of the kids or to take him down. She wasn't out for anything. She told you. She didn't want things bad to happen to him. *She told you the truth*. That's what she said. This happened. She said through Stephanie— Stephanie told you she said she wants him to get help, and so she speaks out, and she spoke out this last week. Her statements about what happened that night are consistent,

13

and I ask you to consider the weight and credit of each witness and decide the facts." (Emphasis added.)

After trial was concluded, the defense filed a motion for new trial based on newly discovered evidence and because of jury misconduct.

The claim of newly discovered evidence centered on the late revelation of the Reed disciplinary report, which, the defense argued, constituted a *Brady* violation. Hirsh asserted that his trial strategy may have been different—he might have called Reed to testify—had he known about the information in the report earlier.

In support of the jury misconduct allegation, a sealed affidavit signed by alternate juror D.M. was filed. It read in pertinent part, with full names of jurors replaced by the initials we have referenced above:

> "2. Following the announcement of the verdict in State v. Hirsh and after the jurors had been reunited with the alternate jurors, the three female jurors discussed their own past personal experience with domestic violence with the entire jury panel present, including the two alternate jurors. The three female jurors had not responded regarding their experience with domestic violence when prompted to do so by the State during voir dire.
>
> "3. Juror [C.C.] shared with those present that she had been battered in a prior relationship.
>
> "4. Juror [L.S.] stated her former husband put a gun to his own head and threatened to kill himself in her presence. She said she stayed in that relationship another three years following the incident before divorcing.
>
> "5. Juror [D.H.] also recounted experience with domestic violence, although I cannot now recall the specifics due to the length of time that has passed.

14

"6. The three female jurors argued with the male jurors that as men, they could not understand the facts of the case and could not understand why Candice Hirsh remained in her marriage to Darrin Hirsh following the alleged March 12, 2013, incident. The female jurors state that as men, the male jurors did not realize it is not easy to leave [a marriage even though a victim of domestic violence]. I questioned the other jurors if Darrin Hirsh actually committed an act of violence against Candice Hirsh, why were there no marks on her, and no witnesses who came forward, e.g., her supervisor, coworkers, or anyone else? In reply, one of the female jurors stated that Candice Hirsh had told the same story six times.

"7. The jurors liked the fact that Candice Hirsh told the same story six times about the March 12, 2013, incident but failed to acknowledge the inconsistencies in her story, or the fact that her versions of the story varied over the six times. I questioned the other jurors if they put any credence into the fact that Candice Hirsh had recanted her story."

In the view of the defense, the three female jurors described in the affidavit committed misconduct during voir dire when they "failed to answer in the affirmative" after being asked "directly whether any personal experiences or feelings may make them unable to be impartial and fair in this case" and actively hid information or were deceptive because they failed to describe their experiences with domestic violence.

The district judge denied Hirsh's motion, rejecting Hirsh's newly discovered evidence argument because the disciplinary report "was not so material as to produce a different result on retrial if the defendant would have received it sooner." The district judge also ruled that Hirsh "failed to demonstrate the necessity to recall jurors" and that there was "no evidence of juror misconduct." The district judge also explicitly adopted a State argument that the jurors were never asked directly as individuals or as a group whether they had been victims or had known victims of domestic violence.

15

When Hirsh's *Brady* claim came before the Court of Appeals, the panel rejected it, reasoning in part:

> "[T]here was no suppression of any evidence by the prosecutor. The report in question was a misconduct report made by Green against Reed based on Reed's failure to report the incident involving Candice to an on-duty deputy or the duty officer in the sheriff's department. There is no way the prosecutor, an assistant attorney general, would have known of the misconduct report because Green admitted that he never disclosed the report to the KBI. Green was Hirsh's own witness, not the State's. The prosecutor learned about the report the same time as Hirsh learned about it—when Green was on the witness stand." 54 Kan. App. 2d at 724.

The panel also held in the alternative that any *Brady* error was harmless because the disciplinary report's reference to the attack on Candice occurring in the basement of the Hirsh home was not material. 54 Kan. App. 2d at 724-25.

DISCUSSION

We address the issues in Hirsh's petition for review in the order we listed them above.

Brady *Violation*

Hirsh relies upon the Reed disciplinary report to demonstrate a violation of his due process right to timely disclosure of exculpatory evidence in the possession of the State under the Fourteenth Amendment to the United States Constitution, as articulated in *Brady*.

Again, Hirsh made this argument for the first time in his motion for new trial, specifically that portion of his motion based on newly discovered evidence under K.S.A.

16

2018 Supp. 22-3501(1). It is questionable whether the disciplinary report truly qualified as "newly discovered" rather than, perhaps, "belatedly discovered." As the State points out in its briefs to the Court of Appeals and this court, the defense had an entire weekend between Green's testimony and closing of its case in which it could have attempted to capitalize upon the report's reference to Hirsh's violence occurring in the basement rather than the bedroom of the house, which tended to impeach Candice's account. The defense made no such attempt. The State cites only K.S.A. 60-404 in support of its preservation point, and it is inapplicable. That statute deals with objections to admitted or excluded evidence. The report was neither, because no party ever sought to admit it.

Under these circumstances and the absence of steam to power the State's lack-of-preservation argument, we will not rebuff Hirsh's *Brady*-based claim that he is entitled to a new trial for failure to preserve it by an objection lodged during trial. Apparently this was the approach the Court of Appeals settled upon, as it did not even mention this State argument at all. As discussed below, Hirsh loses on the merits on this claim.

"A trial court's determination as to the existence of a *Brady* violation is reviewed de novo with deference to the trial court's findings of fact, but the trial court's denial of the defendant's motion for new trial is reviewed under an abuse of discretion standard." *State v. Warrior*, 294 Kan. 484, Syl. ¶ 13, 277 P.3d 1111 (2012); see also *State v. Williams*, 303 Kan. 585, 595, 363 P.3d 1101 (2016).

> "Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, in other words, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, in other words, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, in other words, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citation omitted.]" *Warrior*, 294 Kan. at 505.

There are no facts at issue on the timing or circumstances of the revelation of the report. Both the prosecutor and defense counsel learned of its existence and content at the same time—in court when Green was asked about the document he brought with him. There also is no dispute that Green had not informed the KBI of the report during its investigation of Hirsh's case. The report evidently rested quietly in the files of the Barton County Sheriff's Department until it came to light during Hirsh's trial.

With no dispute of fact that would require this court's deference to the district judge's findings, we turn to the analytical steps we take when conducting a *Brady* legal analysis.

"Under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), prosecutors have a positive duty to disclose evidence favorable to the accused when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

"Because law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement.

"Evidence that is favorable to the accused encompasses both exculpatory and impeachment evidence. For *Brady* purposes, there is no distinction between these two types of evidence that are favorable to the accused; thus, impeachment evidence is considered exculpatory.

"There are three components or essential elements of a *Brady* violation claim: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.

18

"Under the test for materiality governing all categories of *Brady* violations, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Warrior*, 294 Kan. 484, Syl. ¶¶ 7-11.

The Court of Appeals panel strayed from this path when it rejected Hirsh's *Brady* argument in part because the prosecutor had not "suppressed" the report, learning of it at the same time as the defense. This reasoning was infirm.

Although *Brady* certainly is designed to discourage deliberate concealment of exculpatory information by government actors, it also is designed to discourage mere carelessness. This is the reason that, under *Brady*, we impute the knowledge and possession of information by law enforcement to the prosecutor. "[A] *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement." *Warrior*, 294 Kan. at 505-06 (law enforcement's knowledge imputed to State); see *State v. Francis*, 282 Kan. 120, 150, 145 P.3d 48 (2006) ("*Brady* suppression occurs even when the government fails to turn over evidence that is not known to the prosecutor if it is known to police") (citing *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S. Ct. 1555, 131 L. Ed. 2d 490 [1995]). This provides an incentive for prosecutors to be certain that they are routinely made aware of all material on a case that has been uncovered by investigators and that anything tending to exonerate the accused is shared promptly with defense counsel.

At least two other circumstances in this case qualify as quirky and potentially significant.

First, the criminal investigation of Hirsh was subject to an early handoff from the Barton County Sheriff's Department to the KBI. Thus the KBI was the law enforcement agency mainly responsible for supporting the eventual charges against Hirsh, and it did not fail to inform the prosecutor of the disciplinary report. No one at the KBI had knowledge or possession of the report that could be imputed to the prosecutor.

Second, this case differs from many involving *Brady* material because, strictly speaking, as alluded to above, we are not talking about an undisclosed report but a belatedly disclosed report. There was certainly delay, but everyone outside of the Barton County Sheriff's Department learned of the report's existence and content before the close of the defense case at trial. As the State has fully detailed in its briefs, delayed rather than absent disclosure of exculpatory information may or may not qualify as a *Brady* violation, depending on whether the defendant can establish prejudice due to his or her inability to use the *Brady* material effectively at trial, as well as an appeal at the state or federal appellate court in which the issue arises. See *Gill v. City of Milwaukee*, 850 F.3d 335, 343 (7th Cir. 2017) (*Brady* does not require pretrial disclosure; disclosure with enough time for defendant to use is sufficient); *Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008) (no prejudice if disclosure allows effective use at trial); *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005) (due process satisfied, in part, because information known in time for use); *State v. Guilbert*, 306 Conn. 218, 272, 49 A.3d 705 (2012) (evidence disclosed during trial not suppressed within meaning of *Brady*, quoting *State v. Walker*, 214 Conn. 122, 126, 571 A.2d 686 [1990]); *State v. Clifton*, 296 Neb. 135, 163-64, 892 N.W.2d 112 (2017) (information known to State week before trial; no *Brady* violation, in part, because defense had opportunity to cross-examine using evidence); *State v. Pickens*, 141 Ohio St. 3d 462, 483, 25 N.E.3d 1023 (2014) (no *Brady* violation if disclosed with enough time to use information); *State v. Pinder*, 114 P.3d 551, 557-58 (Utah 2005) (no suppression where defendant had opportunity to use information, information known before trial, or defendant reasonably should have known

20

of evidence); *Thomas v. State*, 131 P.3d 348, 353 (Wyo. 2006) (due process satisfied if evidence is disclosed with enough time for defendant to use evidence).

These circumstances raise interesting legal questions, but they ultimately are not among the questions we must answer to resolve this issue. Even if we assume (a) that the report's reference to the basement of the Hirsh home was exculpatory because it could have contributed to impeachment of Candice, (b) that the report's presence in Barton County Sheriff's Department files qualified as law enforcement knowledge or possession that must be imputed to the prosecutor, and (c) that revelation of the report during Green's testimony came late enough in the case to hamstring effective defense use of the report's content, we simply are not persuaded that a lone word in the report qualified as "material" under *Brady* and its progeny.

> "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . . [The] touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 [1985]).

The statement about the basement in the disciplinary report was attributed to Candice via Schwartz. Certainly, Candice's credibility was at the heart of the State's case. She was the alleged victim and only eyewitness to testify for the State. There was no biological or other forensic evidence. But the jury had already heard abundant evidence of Candice's inconsistency on details and her intermittent blanket denials of her husband's

21

violence. She admitted to them herself, including deliberately lying on multiple occasions to people involved in the investigation. The jury also heard Wondra's doubts concerning the "integrity" of her initial interview with Candice. Despite all of this, the jury obviously found the bulk of Candice's version of the events convincing enough to convict Hirsh of most of the charges against him.

With this context, the impeachment value of one use of the word "basement" versus "bedroom" is negligible. We also note that the impact of the word would have been minimized if not negated by its multiple hearsay nature. It could also have been attributable to a scrivener's error. At least one witness—Martell—talked about being in the basement with Hirsh when Candice summoned him upstairs. Impeachment of Candice's credibility simply would not have been measurably enhanced by greater defense attention to or use of the report. There was no reasonable probability that Hirsh would not have been convicted if the report had been produced to the defense earlier. Our confidence in the outcome of the trial is not undermined.

*Multiplicity*

Hirsh challenges his two convictions of criminal threat—based on his threat to kill Candice and his threat to kill their children—as multiplicitous. We first address whether Hirsh has preserved this issue for appellate review.

Hirsh concedes that he did not object on this basis in district court. "In general, issues not raised before the trial court cannot be raised for the first time on appeal." *State v. Rizo*, 304 Kan. 974, 978, 377 P.3d 419 (2016). There are, however, notable exceptions to this rule:

"(1) [T]he newly asserted claim involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) the claim's consideration is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court's judgment may be upheld on appeal despite its reliance on the wrong ground or reason for its decision." *State v. Ander*son, 294 Kan. 450, 464-65, 276 P.3d 200 (2012).

Hirsh's multiplicity claim fits within the second exception, as it brings both the Fifth Amendment's Double Jeopardy Clause and §10 of the Kansas Constitution's Bill of Rights into play and we have recognized that "multiplicity may be considered for the first time on appeal in order to serve the ends of justice and prevent a denial of fundamental rights." *State v. Harris*, 284 Kan. 560, Syl. ¶ 2, 162 P.3d 28 (2007); see also *State v. King*, 297 Kan. 955, 970, 305 P.3d 641 (2013).

We also note in passing that one might argue that the State also faces a preservation hurdle. It did not file a cross-petition for review of the Court of Appeals determination that Hirsh's implied threat to kill Candice and his implied threat to kill the couple's children qualified as the same conduct under the first step in a multiplicity legal analysis. But we regard this as a necessary subissue requiring our attention in evaluating Hirsh's claim rather than a preservation misstep by the State.

Multiplicity challenges raise questions of law subject to unlimited appellate review. See 297 Kan. at 970 (citing *State v. Schoonover,* 281 Kan. 453, 462, 133 P.3d 48 [2006]). In addition, the interpretation of statutes necessary to multiplicity analysis is subject to de novo appellate review. See *King*, 297 Kan. at 971-72.

"When a statute is plain and unambiguous, a court must give effect to its express language, rather than determine what the law should or should not be. The court will not speculate on legislative intent and will not read the statute to add something not readily

23

found in it. If the statute's language is clear, there is no need to resort to statutory construction." *Graham v. Dokter Trucking Group*, 284 Kan. 547, Syl. ¶ 3, 161 P.3d 695 (2007).

K.S.A. 2018 Supp. 21-5415(a) defines a criminal threat as any threat to "[c]ommit violence communicated with intent to place another in fear . . . or in reckless disregard of the risk of causing such fear." In this case, the written instructions to the jury focused on the intended crime. The judge's oral instructions stated that Hirsh's conduct must have been knowing. Neither mentioned "reckless disregard." Neither party has taken issue with any variation in what the jury was told about these culpable mental states.

In *Schoonover*, we outlined the applicable analytical framework for multiplicity issues. We explained there are two broad components necessary to conclude that an accused's right to be free from a double jeopardy violation had been abridged through multiplicitous convictions. Both components must be present in order to hold that the convictions are for the same offense.

"In analyzing a double jeopardy issue, the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one? Under the first component, if the conduct is discrete, i.e., committed separately and severally, the convictions do not arise from the same offense and there is no double jeopardy violation. If the charges arise from the same act or transaction, the conduct is unitary and the second component must be analyzed to see if the convictions arise from the same offense. Under the second component, it must be determined whether the convictions arise from a single statute or from multiple statutes. If the double jeopardy issue arises from convictions for multiple violations of a single statute, the unit of prosecution test is applied. If the double jeopardy issue arises from multiple convictions

24

of different statutes, in other words it is a multiple description issue, the same-elements test is applied." *Schoonover,* 281 Kan. 453, Syl. ¶ 15.

Factors considered to determine whether convictions arise from the same or "unitary" conduct, satisfying the first component of the *Schoonover* rubric, are:

"(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." 281 Kan. at 497.

Hirsh's statements were both made to Candice, first that his attack on her personally would be "over soon" and, second, that his children would "follow." They apparently were made only seconds apart. Their connective tissue was Candice's plea that he not let the children see her "like this." The statements both occurred on the bed in one of the rooms of the family home, while Hirsh continued to pin Candice to the bed by straddling her and using a pillow and gun to smother and subdue her. There does not appear to be a causal relationship between the statements; they were both embedded in a string of harsh words and violent acts that made up the fight over Martell. To the degree there is a distinction in their causation, it must arise from Candice's plea. The second was prompted by Candice's response to the first. Only in this way might it be said that the second was motivated by that "fresh impulse."

Given that the four factors we consider point to different resolutions, whether Hirsh's threat to kill his wife and his threat to kill his children qualified as the same or "unitary" conduct under *Schoonover* is a close call. Ultimately, because they occurred in such a brief time period and in the same place, were directed at the same fearful Candice, and, especially, shared a genesis in the overall fight about Martell, which qualified as a

25

single act or transaction, we agree with the Court of Appeals panel that Hirsh has demonstrated that they are the same or "unitary" conduct under *Schoonover*.

We next turn to the second component, which examines the statutory definition of criminal threat. This is a case where each of the two convictions was based on a violation of a single statute. Thus, the "unit of prosecution" test applies under *Schoonover*.

> "If the double jeopardy issue arises because of convictions on multiple counts for violations of a single statute, the test is: How has the legislature defined the scope of conduct which will comprise one violation of the statute? Under this test, the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. There can be only one conviction for each allowable unit of prosecution. The unit of prosecution test applies under either the Double Jeopardy Clause of the Fifth Amendment or § 10 of the Kansas Constitution Bill of Rights." 281 Kan. at 497-98.

In *State v. King*, this court applied the unit of prosecution test to a case involving criminal threats under a similar version of the criminal threat statute. In that case, a jury convicted defendant Kameron King of three counts of making a criminal threat violating K.S.A. 21-3419(a)(1) for communicating a single threat to kill to a group of three people. On appeal, King argued that his convictions were multiplicitous. Because the State conceded the convictions for criminal threat arose from the same conduct, this court focused on the second part of the *Schoonover* test: Were there one or three offenses under the statutory definition? *King*, 297 Kan. at 969-71.

This court concentrated on the first six words of the statute to define the prohibited conduct, and therefore the unit of prosecution—"'[a] criminal threat is any threat'"—and held that a single threatening statement communicated to a group of people constituted one crime. 297 Kan. at 974 (quoting K.S.A. 21-2419); cf. K.S.A. 2018 Supp. 21-5415 (identical wording; "[a] criminal threat is any threat"). "[A] communicated threat

26

constitutes only one offense even if it is perceived and comprehended by multiple victims." In other words, the focus is on the accused's behavior in a criminal threat case, not on the number of his or her victims. 297 Kan. at 975.

With *King*'s interpretation of the statute as our guide, we have no hesitation in holding that there are two units of prosecution for criminal threat in this case. Just as we did in *King*, we focus on the behavior of Hirsh, not on the fact that both statements were communicated to one person, Candice, or on the fact that the statements pledged violence distinct from one another—the first alone and the second directed at the children. What matters is that Hirsh spoke twice and that each time he spoke there was a "threat to . . . [c]ommit violence communicated with intent to place [Candice] in fear." Each of Hirsh's utterances was a completed crime of criminal threat under the unit of prosecution designed by the Legislature.

Because Hirsh cannot demonstrate the second component under our *Schoonover* rubric, that is, only one unit of prosecution for criminal threat, there is no double jeopardy or multiplicity problem here.

*Prosecutorial Error*

Hirsh essentially challenges one sentence of the prosecutor's closing argument referring to Candice as error: "She told the truth." The defense need not object in order to preserve the issue for appeal. See *State v. Sean*, 306 Kan. 963, Syl. ¶ 5, 399 P.3d 168 (2017) ("Generally[,] appellate courts do not require a contemporaneous objection to preserve issues of prosecutorial error for appellate review.").

Review for prosecutorial error involves a two-step analysis:

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial.

"In evaluating the prejudice step of our two-step analysis for reversible prosecutorial error, appellate courts shall look no further than, and shall exclusively apply, the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Prosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict." *State v. Sherman*, 305 Kan. 88, Syl. ¶¶ 7-8, 378 P.3d 1060 (2016).

We have repeatedly said that a prosecutor telling a jury in opening statement or closing argument that a witness told the truth is error. See, e.g., *State v. Knox*, 301 Kan. 671, 683-85, 347 P.3d 656 (2015) (error to say witness "'was brutally honest on the stand,'" told "'the truth'"; "comments were unsworn and unchecked statements that are not fair commentary on the evidence"); *State v. Dull*, 298 Kan. 832, 837, 317 P.3d 104 (2014) (prosecutor's statement that victim's story "'the truth'" outside wide latitude afforded prosecutors); *State v. Elnicki*, 279 Kan. 47, 64, 105 P.3d 1222 (2005) (prosecutor said "'you know [the victim] was telling you the truth'"; improper comment on credibility). Based on this longstanding Kansas caselaw, the prosecutor erred.

Turning to reversibility, the comment was singular and isolated. It was not repeated or emphasized, and it does not appear from the record to have been deliberate.

28

Two witnesses—David and Stephanie—testified that they saw bruising on Candice the morning after the attack and testified as to what Candice told them. Furthermore, the prosecutor reminded jurors that it was their job to determine the credibility of witnesses just before the improper remark: "You get to determine the weight and credit to be given the testimony of each witness." Just after the remark, the prosecutor said, "I ask you to consider the weight and credit of each witness and decide the facts." Under these circumstances, there is no reasonable possibility that the error contributed to the verdict.

*Refusal to Recall Jury and Related Motion for New Trial*

Hirsh also argues before us that the district judge erred by refusing to recall the jury to explore whether C.C., L.S., and D.H. committed misconduct during voir dire and in denying the motion for a new trial insofar as it was based on jury misconduct.

A district judge's decision to deny a motion to recall a jury is reviewed for an abuse of discretion. *State v. Smith-Parker*, 301 Kan. 132, 165, 340 P.3d 485 (2014). And

> "[a]llegations of juror misconduct trigger a progressive two-step inquiry to determine if either a mistrial or new trial is warranted: (1) whether juror misconduct occurred, and (2) if so, whether the misconduct substantially prejudiced the right to a fair trial, meaning whether the State can show beyond a reasonable doubt that the misconduct did not affect the trial's outcome." *State v. Longoria*, 301 Kan. 489, 530, 343 P.3d 1128 (2015).

A judge's discretion to deny a motion to recall a jury is limited if a defendant's constitutional right has been violated during trial. *State v. Jenkins*, 269 Kan. 334, 338, 2 P.3d 769 (2000). "At this point, there is a greater reason for the judge to articulate the reasons for his or her 'discretionary' decision." 269 Kan. at 338.

29

And, again, we review denial of a defendant's motion for new trial for abuse of discretion. *Williams*, 303 Kan. at 595. To the extent we are required to reach any allegation that jury misconduct infringed Hirsh's right to due process, we exercise unlimited review. *Smith-Parker*, 301 Kan. at 165.

In his brief to the Court of Appeals, Hirsh asserted that the only way to determine if the jurors committed misconduct was to recall the jury and make findings based on the testimony of the jurors.

In *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842 (1987), we said,

> "Jurors may be recalled for post-trial hearings only by order of the court after a hearing on a request to recall the jury. A recall of the jury is not a routine matter. Jury service is a public duty of citizens and recall of jurors after their service has ended to testify as to events occurring in the jury room during deliberations is a serious step. That step is to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing party's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking an order to recall the jurors to show the necessity for the order. [Citation omitted.]"

Hirsh's argument does not persuade us that the district judge erred by refusing to recall the jury because the transcript of voir dire simply does not support any allegation that the three jurors in question ever failed to respond appropriately during voir dire. C.C., L.S., and D.H. were never asked directly whether they knew, or had been, a victim of domestic violence. Neither counsel asked the panel as a group whether they knew any victims of domestic violence or if they had been victims themselves. There was no actual deceit and no apparent intention to deceive. Without material in the record for such support, Hirsh cannot meet the *Ruebke* threshold of just cause to recall jurors. Put another way, when the trial record irrefutably demonstrates that there was no misconduct under

30

the first step enunciated by *Longoria*, there is no reason to inquire of jurors to determine the extent and effect of misconduct.

This case is analogous to *State v. Hopkins*, in which defendant Daniel R. Hopkins filed a motion for new trial after his conviction for rape. A juror, L.W., had come forward and submitted an affidavit in which he admitted that he failed to disclose during voir dire that an ex-girlfriend had been raped. Although certain jurors were asked at voir dire if they knew anyone who had been raped, L.W. was not. Moreover, that question was never directed to the entire panel. The district judge held a hearing on the motion but denied it because L.W. never gave a "'false declaration . . . [and there was not] the opportunity to make one.'" *State v. Hopkins,* 257 Kan. 723, 724-25, 896 P.2d 373 (1995). On appeal, this court affirmed the district judge's decision not to recall the jury. This court focused on the fact that "[L.W.] was never directly asked if he knew anyone who had been raped" even though "[a] careful reading of the transcript reveals that a very alert potential juror sitting in the courtroom during the questioning of the panel and other potential jurors would have realized counsel was interested in whether a potential juror knew a rape victim." 257 Kan. at 725. This court reasoned that "'[j]uror misconduct must be based on more than the failure to volunteer information a potential juror speculates or surmises is important to counsel." 257 Kan. 723, Syl. ¶ 4.

The situations in this case and in *Hopkins* are plainly distinguishable from that in *State v. Jenkins*, 269 Kan. 334, 2 P.3d 769 (2000). In that case, we reversed defendant Walter Jenkins' conviction for second-degree murder when the district judge refused to recall the jury despite one juror's admission to several lies in response to specific voir dire questions. The district judge did not abuse his discretion in refusing to recall the jury or in denying the motion for a new trial insofar as it was based on jury misconduct.

31

*Cumulative Error*

Hirsh's final argument is that cumulative error deprived him of a fair trial.

"Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. . . . *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009)." *State v. Hart*, 297 Kan. 494, 513-14, 301 P.3d 1279 (2013).

In assessing whether the cumulative errors are harmless error, we examine

"the errors in the context of the record as a whole considering how the trial judge dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. 'No prejudicial error may be found upon this cumulative effect rule . . . if the evidence is overwhelming against the defendant.' [Citations omitted.]" *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

Even if we assume an individually immaterial *Brady* error exists, it does not, when considered in combination with a single-sentence, individually harmless prosecutorial error during closing argument, compel us to employ the cumulative error doctrine and reverse. Hirsh's jury, despite significant impeaching evidence, decided to accept Candice's trial version of events. It would not have done otherwise had these two relatively minor errors not occurred.

CONCLUSION

Although our reasoning differs from the Court of Appeals decision on the *Brady* claim, we affirm its decision. Per that decision, the judgment of the district court is

32

affirmed in part, reversed in part, and vacated in part, and the case is remanded for further proceedings.

* * *

BEIER, J., concurring: I concur in all aspects of the majority opinion save one. I do not accept that the threats made by the defendant, separated by a plea from his wife to which he obviously reacted, qualify as the same or "unitary" conduct under our multiplicity/double jeopardy analysis. See *State v. Schoonover,* 281 Kan. 453, 462, 133 P.3d 48 (2006).

When Candice Hirsh became concerned by her husband's first threat and extreme violence that she would die, she begged him not to let their children see her "like this." Her husband's second threat sprang directly from that source; it was motivated by a "fresh impulse." And that factor is enough to convince me that the admittedly close question of whether there was the same or "contrary" conduct should be answered with a firm "no." See *State v. Sellers*, 292 Kan. 346, 357-60, 253 P.3d 20 (2011).

Because I would reject the defendant's multiplicity challenge on the first component of *Schoonover*, I would not need to reach or analyze the second. 292 Kan. at 360.

ROSEN and STEGALL, JJ., join the foregoing concurring opinion.

* * *


JOHNSON, J., dissenting in part:  I dissent on the majority's determination that there were two units of prosecution with respect to criminal threat. I would reverse one of the convictions.